STATE *v.* HARRIS BROWN.

February Term, 1931.

Present:  POWERS, C. J., SLACK, MOULTON, and THOMPSON, JJ.

Opinion filed April 23, 1931.

*J. A. McNamara* for the respondent.

315

*Lawrence C. Jones,* Attorney General, and *C. O. Granai,* State's attorney, for the State.

SLACK, J.   This is a prosecution in Washington county court for receiving stolen property.   The information alleges that the property was stolen in that county and was received by the respondent at Burlington in the county of Chittenden.

The prosecution is predicated upon G. L. 6870, which provides: "A person who buys, receives or aids in the concealment of stolen property, knowing the same to be stolen, shall be prosecuted the same as for the stealing of such property; and such buyer, receiver or concealer may be prosecuted and punished in the same court and in the same county where the person stealing the property might be prosecuted, although such property is bought, received or concealed in another county."

The respondent moved to dismiss the information on the ground that the statute in question violates Chapter 1, Article X of our Constitution, which provides: "That in all prosecutions for criminal offenses, a person hath a right to * * * * a speedy public trial by an impartial jury of the country."   The motion was overruled and the question thus presented is here for review.

This is a new question in this jurisdiction, and is an interesting and important one.   Whether this prosecution can be maintained is first considered on the assumption that the nature of the crime charged is immaterial.

At the common law criminal offenses, generally speaking, were deemed to be local and subject to prosecution only in the county where committed.   In the early ages of English jurisprudence jurors who were impanellel to try either civil or criminal causes were themselves the witnesses, and rendered their verdict upon their own knowledge, and therefore, in order that they might be qualified to perform their functions, they were summoned from the *visne* or neighborhood of the place where the matter to be tried arose.   When at a later period they were required to find their verdict upon the evidence of witnesses, it was still deemed important that they should come from the place where the witnesses lived and where the dispute originated, since jurors from the *visne* or neighborhood were re-

garded as more likely to be qualified to investigate and determine the truth than persons living at a distance from the scene of the transaction. It was said, too, that the accused would thus have the benefit, on his trial, of his own good character and standing, if these he had preserved; as well as the benefit of such knowledge as the jurors might possess of the witnesses who gave evidence against him. In the main, the reasons for the rule seem to have little merit at the present time, since they rest upon the assumption that the offender would confine his operations to his own locality or neighborhood. This perhaps was likely to be so with the means of travel then available, for presumably many people never got beyond the bounds of their neighborhood, but it would hardly hold true today. But whether the reasons for the rule were meritorious or otherwise, generally speaking, a person accused of a criminal offense had the right at common law to be tried by a jury of the *visne,* which though originally more limited came to be understood to be the county where the offense was committed, and such was the general common-law rule at the time our Constitution was adopted. 1 Chitty's Crim. Law, 177; 3 Reeve's History of English Law, 426; Black. Com. 349; Hawk. P. C. b. 2, c. 40; Hale P. C. 364; Cooley's Const. Lim. vol. 1, p. 676. Indeed, the rule was formerly so imperative that if an offense was committed partly in one county and partly in another, the offender was not punishable at all. Hawk. P. C. b. 2, c. 25; 1 Chitty's Crim. Law, 177. The fallacy of this inhibition, however, led to its early abandonment. The general rule, like most others had its exceptions. Stephens in his History of the Criminal Law in England at page 277 says that there were eighteen statutory exceptions to the rule requiring an indictment to be found by the grand jury of the county where the offense was committed.

Whether the so-called common-law rule respecting the place of trial of criminal causes obtains in this State depends upon the construction to be given to that part of our Constitution quoted above. Unless the Legislature is thereby restricted from so doing, it may provide for the prosecution of any offense, in the first instance, in a county other than the one in which it was committed. *Watt* v. *People,* 126 Ill. 9, 18 N. E. 340, 1 L. R. A. 403; *State* v. *Lewis,* 142 N. C. 626, 55 S. E. 600, 7 L. R. A. (N. S.) 669, 9 Ann. Cas. 604; *Mischer* v. *State,* 41 Tex. Crim. Rep., 212, 53 S. W. 627, 96 A. S. R. 780; *Brown* v. *State,* 57 Tex.

Crim. Rep., 269, 122 S. W. 565; *Eckermann* v. *State*, 57 Tex. Crim. Rep. 287, 123 S. W. 424; 8 R. C. L., p. 99; note, 9 Ann. Cas. 615. On the other hand, if the effect of this constitutional provision was to adopt the general common-law rule respecting the place of trial of criminal offenses the statute in question is void. *Swart* v. *Kimball*, 43 Mich. 443, 5 N. W. 635; *People* v. *Brock*, 149 Mich. 464, 112 N. W. 1116, 119 A. S. R. 684; *People* v. *Powell*, 87 Cal. 348, 25 Pac. 481, 11 L. R. A. 75.

An exhaustive examination of the cases fails to disclose a single instance where the court has been called upon to construe a constitution like ours. Indeed, the only other constitution that we have found which provides for a trial of criminal offenses by a jury of the *country* is that of Pennsylvania adopted in 1776, the year before our own was adopted.

Many of the constitutions expressly provide for a trial in the county or district where the offense was committed. A citation of authorities to show that such provisions admit of no legislative encroachment is unnecessary. The constitution of Michigan in force when *Swart* v. *Kimball* and *People* v. *Brock* were decided provided that the right of trial by jury should remain inviolate, and it was held that a statute which provided for a trial elsewhere than in the county where the offense was committed was invalid. So, too, in California, a similar constitutional provision was given like effect in *People* v. *Powell*. Constitutional provisions for a trial in the county or district in which the offense *is alleged* to have been committed (*Watt* v. *People*), for a trial by a jury of good and lawful men (*State* v. *Lewis*), for a trial by an impartial jury (cases cited from Texas), for a trial by a jury of the vicinity (*State* v. *Sweetsir*, 53 Me. 438), that in criminal prosecutions, the verification of facts in the vicinity where they happened, is one of the greatest securities of the life, liberty, and property of the citizens (*Com.* v. *Parker*, 2 Pick. [Mass.] 549; *Crocker* v. *Justices of the Superior Court*, 208 Mass. 162, 94 N. E. 369, 21 Ann. Cas. 1061), etc., are not regarded as restrictive of legislative action on the subject.

Our Constitution entitles the accused to a trial by a jury of the *country;* not a jury of the *visne*, or of the *vicinage*, or of the *county*, unless it must necessarily be held that such was the sense in which its framers used the word "country." To ascertain what they intended by the use of this language it

is proper to consider the information which they presumably possessed respecting the laws of the mother country and the other states of the Union, and when this is done their use of the word "country" instead of "visne" or "vicinage," both of which then had a well-defined meaning, becomes significant. The conclusion is irresistible that they meant something other than the "visne" or the "vicinage," and the word "country" certainly has a broader rather than a narrower meaning than those words. If they borrowed the word "country" from the Pennsylvania constitution, as they undoubtedly did, since it is a historical fact that that instrument was the model most frequently consulted by them, it may be assumed that they used the word in the same sense as did those who framed, and operated under, that instrument. It is important, therefore, to see what significance the framers of the Pennsylvania constitution attached to the word "country." Prior to the adoption of their first constitution, the jury was described as "of the neighborhood," which had the same meaning at common law as *visne* and *vicinage*. Section 9, Article 1 of that constitution provided that in all prosecutions for criminal offense, a man hath a right, *inter alia,* to a "speedy and public trial by an impartial jury of the country, without the unanimous consent of which jury he cannot be found guilty, nor can he be compelled to give evidence against himself, nor can any man be justly deprived of his liberty, except by the laws of the land or the judgment of his peers." It will be noted that this changed the jury from one of the "neighborhood" to one of the "country." In 1784 the Council of Censors adopted for recommendation as an amendment to the constitution the following for the reasons therewith stated: "In the Bill of Rights, sec. 9, that there be added after the words 'judgment of his peers' the words 'of the vicinage.' Because the verification of the facts in the vicinity where they happened, is one of the greatest securities to life, liberty and happiness." Attention is called to the fact that the reasons assigned for this proposed change are stated in very nearly the language of the Massachusetts constitution quoted above, because we shall have occasion to speak of the effect of the latter constitution later. While for some reason the contemplated amendment to the Pennsylvania constitution was not recommended, the change came in 1790 by an amendment which secures to the accused a speedy and public trial by an impartial

jury of the "vicinage," thus substituting the latter word for the word "country." The changing of the Pennsylvania constitution, and the history respecting it, see *Com.* v. *Collins,* 47 Pa. C. Ct. R. 608, leaves no room for doubt that in that jurisdiction the word "country" was deemed to embrace more territory than the neighborhood, the *visne,* or the *vicinage.* We think such was the understanding that led the framers of our Constitution to use the word "country" rather than one of more restricted meaning. The legislative interpretation of this provision since 1797 supports this conclusion. In that year the Legislature passed an act providing that a person who struck or poisoned another in one county, if the latter died as the result of such stroke or poisoning in another county, might be prosecuted in either county. R. 1797, Chapter IX, section 36. (Now G. L. 2519.) Since then various acts have been passed, which are embodied in the General Laws, providing for the trial of criminal offenses in some county other than the one where the offense was committed. These relate to trials for treason, G. L. 6787; trials for duelling, in certain circumstances, resulting in death, G. L. 6810; trials of accessories before the fact, G. L. 7119; trials of offenses committed within one hundred rods of the boundary between two counties, G. L. 2520; trials for receiving stolen property, G. L. 6870; and change of venue in certain instances, G. L. 2523. The latter statute was passed in 1865 and was probably the result of the decision in *State* v. *Howard,* 31 Vt. 414. That was a prosecution for manslaughter pending in Orange County. The State moved for a change of venue on the ground that a fair and impartial trial could not be had in that county. In denying the motion the Court said: "But as the statute provides, in general terms, for the trial of criminal cases in the county where the offense is charged to have been committed, we do not perceive how any court could order a trial in such cases in any other county. There will sometimes arise cases where a change of venue will be desirable, and this may be one of that class. But it will require the interference of the Legislature before that can be done, and it is for them to determine when such provision becomes desirable." This language clearly indicates that the Court entertained no doubt respecting the authority of the Legislature to fix the place of trial in criminal causes. It acknowledged that previous legislative action, and not the Constitution, precluded it

from acting in the matter before it, and that the difficulty could be removed by future legislation.

We are not unmindful of the fact that neither length of time nor legislative action, though oft repeated, will sanction a violation of the organic law which is clearly expressed, or necessarily understood. But resort may be had to such sources to discover the meaning of provision of doubtful import. In Endlich on the Interpretations of Statutes, par. 527, the rule is stated thus: ''And the greatest deference is shown by the courts to the interpretation put upon the constitution by the Legislature, in the enactment of laws and other practical application of constitutional provisions in the legislative business, when that interpretation has had the silent acquiescence of the people, including the legal profession and the judiciary, and especially when injurious result would follow the disturbance of it.'' *Moers* v. *City of Reading*, 21 Pa. 188, 201; *Johnson* v. *J. & C. R. R. Co.*, 23 Ill. 202, 207; *Mayor, etc., of Baltimore* v. *State ex rel. Board of Police*, 15 Md. 376, 74 A. D. 572.

If in the solution of this question we were permitted recourse to the history of the courts of Massachusetts, whence many of our early settlers came, we would find that both before and after the adoption of our Constitution the place for holding criminal trials in that state was the subject of legislative enactment. Formerly, all capital offenses committed in the state were tried by the Court of Assistants, which held sessions only in Boston. Various legislative changes respecting the place of trial in criminal causes were made from time to time, which are noted in an interesting opinion by Parker, C. J., in *Com.* v. *Parker*, 2 Pick. (Mass.) 550. He calls attention to several instances ''within the recollection of some of the Court'' where persons charged with murder were tried in a county other than that where the offense was committed, not by reason of a change of venue, but because the place of trial was so fixed by law.

But irrespective of the situation in Massachusetts, we are satisfied that the framers of our Constitution used the language that they did for the purpose of enlarging the scope of legislative authority over the place of trials in criminal causes, and that such was the effect of their action. Manifestly, this is a function that the Legislature should exercise with great caution. Their conduct in the past indicates that they have so regarded

it, and presumably their future action will be equally circumspect.

■ For the reasons stated, we hold that the statute in question does not violate the constitutional provision invoked by the respondent.

It is unnecessary, therefore, to consider whether because of the nature of the offense charged the respondent could, without this statute, be prosecuted in the county where the property was stolen.

*Judgment affirmed, and cause remanded.*

*Deane C. Davis* for the respondent.

*Lawrence C. Jones,* Attorney General, and *C. O. Granai,* State's attorney, for the State.