# In re Wildlife Wonderland, Inc.

[340 A.2d 645]

No. 218-74

Present: Barney, C.J., Smith, Daley, Larrow and Billings, JJ. and
Larrow and Billings, JJ. (concurring)

Opinion Filed October 7, 1975

*Whalen & O'Dea,* Manchester Center, for Plaintiff.

*M. Jerome Diamond, Esq.,* Attorney General and *Benson D. Scotch, Esq.,* Assistant Attorney General, Montpelier, for Agency of Environmental Conservation.

*Edward R. Kiel, Esq.,* Springfield, for William Marshall.

*Parisi & Broderick,* Castleton, for Town of Mount Holly Planning Commission.

*Benjamin W. Partridge, Jr., Esq.,* West Townshend, for Weston Planning Commission.

*Jonathan N. Brownell, Esq.,* Montpelier, for amici curiae Vermont Natural Resources Council, et al.

**Daley, J.** This is an appeal from a decision of the Vermont Environmental Board denying a land use permit to Wildlife Wonderland, Inc. for the construction and commercial operation of a game farm in the town of Mount Holly, Vermont. The applicant Wildlife, owner of six hundred and twenty-seven acres in the towns of Mount Holly and Weston, sought and was granted a permit by the District Environmental Commission, which found in its favor upon criteria (1) through (10) of 10 V.S.A. § 6086, as amended.

The proposal, for which the applicant obtained District Commission land use approval, is a wild animal farm similar to the Catskill Game Farm in the State of New York. Initially some three hundred wild and domestic animals would be kept for viewing by the paying public in three compounds; each compound, although not definitely located upon the grounds, would encompass an area of three to five acres. The project would entail the construction of a public building with restaurant facilities, a ticket booth, pathways, a miniature railroad amusement ride, and parking facilities for approximately 910 automobiles.

The game farm, utilizing approximately sixty-five acres of the total tract, will set back from Route 155 a distance of not less than 350 feet and will essentially not be visible from the highway. Projected attendance figures are approximately

one hundred thousand paid admissions per season, which will run during the late spring, summer, and early fall. While the game farm would be closed during the winter months, commercial recreational use would be made of the land, such as cross-country skiing. Lands surrounding Wildlife's acreage consist of a 300-acre tract owned by the Weston Priory and used for monastic purposes; a 400-acre tract owned by appellee Marshall presently used for family and friends, recreational and residential in character; and the Green Mountain Natural Forest, a public park. The general area, including the lands of Wildlife, is essentially forest land and commercially undeveloped. The sixty-five-acre parcel has varied topography and is generally wooded. Two main streams, pristine and essentially free from any visible or measureable pollutants, run through this parcel and are headwaters of the West River. The game farm would be located on the easterly side of Route 155, approximately six and one-half miles north of the center of the business district of Weston.

Opponents of Wildlife's application appealed the granting of a land use permit to the Environmental Board. In accordance with procedures set forth in 10 V.S.A. § 6089 governing appeals, de novo hearings were held by the Board upon all criteria of § 6086(a). The Board filed findings and conclusions of law and issued an order vacating the permit previously issued by the District Commission. The denial was based upon the Board's conclusions that there is a reasonable probability that the development will result in undue air and water pollution, 10 V.S.A. § 6086(a)(1); that it will cause unreasonable soil erosion and a reduction in the capacity of the land to hold water, 10 V.S.A. § 6086(a)(4); that it will have an undue adverse effect on the scenic, natural beauty of the area, 10 V.S.A. § 6086(a)(9); that it will unnecessarily and unreasonably endanger the public investment in public lands and will materially interfere with the public's use and enjoyment of public lands, 10 V.S.A. § 6086(a)(9)(K); and that the proposed development is detrimental to the public health, safety and general welfare, 10 V.S.A. § 6087(a).

Wildlife attacks the Board's decision upon the following grounds: that the conclusions of the Board of undue water pollution, unreasonable soil erosion, and reduction in the capacity of the land to hold water are not supported by sub-

stantial evidence; that the findings of the Board of undue air pollution are predicated upon unlawful and improper considerations and are not supported by substantial, relevant evidence; that the Board acted unlawfully when it failed to issue its findings under subdivisions (9) and (10) of 10 V.S.A. § 6086 within twenty days of the final hearing day of the appeal on these subdivisions; that the Agency of Environmental Conservation was not an appropriate party to proceedings before the Board; that the appellants to the Environmental Board lacked standing to be heard; and, that the Environmental Board considered matters not within its jurisdiction and beyond its delegated powers. Each of these claims will be treated *infra*.

## I.

Under 10 V.S.A. § 6088(a), Wildlife has the burden of proving that the proposed development will cause no undue water pollution, 10 V.S.A. § 6086(a)(1), no unreasonable soil erosion, and no reduction in the capacity of the land to hold water. 10 V.S.A. § 6086(a)(4). The Board's order denying Wildlife's permit, supported by findings and conclusions of law, indicates that Wildlife did not successfully meet this burden.

10 V.S.A. § 6089(c) provides that if findings of the Board with respect to questions of fact are supported by substantial evidence on the record as a whole they shall be conclusive. Where a conflict in the evidence develops, its resolution falls within the Board's jurisdiction, for the Board is the proper trier of fact. *In re Barker Sargent Corp.*, 132 Vt. 42, 313 A.2d 669 (1973). The trier of fact has the right to believe all of the testimony of any witness, or to believe it in part and disbelieve it in part, or to reject it altogether. *Ohland* v. *Dubay*, 133 Vt. 300, 336 A.2d 203 (1975). Thus, it is not for this Court to reweigh conflicting evidence, reassess the credibility or weight to be given certain testimony, or determine on its own whether the factual decision is mistaken. *Vermont Terminal Corp.* v. *State Highway Board*, 132 Vt. 1, 313 A.2d 12 (1973).

Voluminous testimony was presented by expert witnesses of all parties. Wildlife offered the testimony of the president of the appellant-corporation; a civil engineer employed by Kinsey

Associates, a New Jersey corporation; and two other civil engineers. It claims that these witnesses "established beyond any reasonable doubt the following facts: (1) Terrain and subsoil conditions are such that the development can be and has been designed and engineered so as to prevent undue water pollution and unreasonable soil erosion; (2) the development has been designed, engineered and laid out in such manner that there will be no undue water pollution, no unreasonable soil erosion, and no reduction in the capacity of land to hold water; (3) proper maintenance and operation of the facilities of the development will be necessary to prevent undue water pollution and unreasonable soil erosion; and (4) the applicant will conduct proper maintenance and operation of the facilities."

The Board, however, made the following findings of fact. Animals housed within the compounds would deposit their waste on the ground, and certain portions of this waste would be absorbed in the ground or bedding materials. Some undetermined amount of fecal matter would remain in the surface run-off attributable to rain or melting snow, although some animal waste would percolate into the soil in the compounds. Wildlife proposes to control surface run-off from compound areas and the parking lots by use of swales or ditches. Such a system could reduce sedimentation reaching streams, but could not serve as treatment of the effluent coming from the compounds. No system for treatment of run-off was proposed by Wildlife. There is a reasonable probability that contaminants, including fecal coliform bacteria, nutrients, and disease organisms from animal wastes and sedimentation would reach the streams running through the area. The two streams in the project area are without visible or measureable pollution, are upland streams, and should be classified as Class A waters. The proposed project will degrade the water quality of the existing streams and proposed ponds. The siltation, nutrients, and phosphates that would be introduced into the streams would be eutrophic, or relatively polluted. Because of the nature of the soil and the presence of fragipan and slopes on the site, limited ground retention of nutrients may be anticipated. Soil erosion from the three compounds, each three to five acres in area, may be anticipated in the first year in the

range of 300 tons of material per acre with a loss of 2½ to 2¾ inches of soil. Manure and other material from the compounds will be transported to exposed compost piles, the location of which was not established. Dead animals, including diseased animals, may be disposed of in the piles. A reasonable probability exists that both animal and human wastes will reach the streams on the property.

The record contains ample supporting testimony for the Board's findings of fact in the form of testimony by appellees' witnesses, qualified as experts before the Board. Their testimony, much of which was adopted by the Board in findings of fact, sufficiently supports the Board's conclusions of undue water pollution, unreasonable soil erosion, and reduction in the capacity of the land to hold water.

The appellant also claims that the Board arbitrarily and summarily disqualified certain of its witnesses. The record discloses no support for the proposition that any witness was "summarily disqualified". Although not determinative, it is interesting to note that the same Board claimed to have "summarily disqualified" these witnesses heard an average of some one hundred pages of testimony from each of them. Wildlife has shown this Court no language or actions of the Board compatible with any notion of bias or any disregard of witnesses' testimony. This Court presumes that all evidence bearing upon issues considered by the trier was heard with impartial patience and adequate reflection. *Smith* v. *Lentini*, 125 Vt. 526, 220 A.2d 291 (1966). A decision contrary to the desires of a party does not denote bias; nor is it inconsistent with the proposition that the evidence proferred by that party was given its natural probative effect.

## II.

Before granting a permit, the Board or District Commission must also find that the development will not result in undue air pollution. 10 V.S.A. § 6086(a)(1). The Board's findings contain substantive evidence on air pollution submitted by Wildlife's engineer and by the appellees' witnesses. The findings also note that Wildlife was subject to air quality standards administered by the Agency of Environmental Con-

servation, but had not obtained a certification from the Agency that the proposed development would be in compliance with State air quality standards. Based on these findings, the Board concluded that there was a reasonable probability that the development would result in undue air pollution. This conclusion must be stricken on jurisdictional grounds because it does not comport with procedure promulgated by the Environmental Board itself under its rule-making power granted by 10 V.S.A. § 6025.

■ Rule 13 (C) (5), 1 *Administrative Procedures Compilation*, p. 8.28, eff. October 9, 1973, was adopted under this rule-making authority and states in substance that an applicant may either obtain a certification of compliance from the Air Pollution Control Agency that no undue air pollution will result and attach a copy to its permit application, or make application without the certification. In the latter instance, the Board or the District Commission will receive no evidence on other applicable criteria and recess the hearing until the applicant obtains the certification and petitions the Board or District Commission to reopen the hearing. Under its own rule, then, when the Board found that Wildlife had failed to obtain an air quality certification of compliance, the Board should have recessed the hearings until that was done. When the Board heard evidence on potential air pollution, made findings thereon, and then concluded that the project would cause undue air pollution, it overstepped its jurisdiction and invaded the province of the Air Pollution Control Agency.

The essential role of the air pollution certification is detailed by Rule 13 (C) of the Environmental Board:

> in the event a . . . development is also subject to standards of and/or requires one or more permits from another state . . . agency, such permits, or in lieu therefor certifications of compliance, *must be obtained prior to issuance of a permit under Act 250* . . . . (Emphasis added.)

And, 10 V.S.A. § 6086 (d) indicates that the certification of compliance creates a presumption that the application is not detrimental to the public health and welfare with respect to the specific subject requirement. On presentation of the certification to the Board, this presumption disappears and the

certification becomes only evidence of compliance with air quality standards when opponents offer evidence to the contrary. See Rule 13(C)(6). Only then can the Board weigh the evidence, as it did here, and make substantive findings and conclusions on, for example, whether or not there is undue air pollution.

While our holding affirming the Board's conclusions of undue water pollution and soil erosion are, according to the language of 10 V.S.A. § 6086(a) and § 6088(a), sufficient by themselves to affirm the Board's denial of the application, we have pointed out the above error to prevent its further occurrence, having in mind the language of *In re State Aid Highway No. 1, Peru, Vermont*, 133 Vt. 4, 328 A.2d 667 (1974), that "questions of fairness involving procedural rights afforded by administrative bodies must be examined when they approach due process problems of constitutional dimension." *Id.* at 9. Had hearings been suspended pending receipt of the air quality certification, and had that certification not been forthcoming, much time and expense could have been avoided on this application, and can properly be prevented in future applications under Act 250.

### III.

Wildlife's next claim of error is founded on the Board's failure to issue its findings and decision on subdivisions (9) and (10) of § 6086(a) within twenty days of the final hearing day on those criteria, as required by 10 V.S.A. § 6086(b). These subdivisions impose upon the applicant the burden of proving that the development complies with duly adopted local or regional land use plans or capital programs under Chapter 91 of Title 24. The record shows that the final hearing day on criteria (9) and (10) was December 12, 1973, yet the Board waited until March 13, 1974, to decide in writing to withhold its appellate decision on criteria (9) and (10) until the complete application, encompassing criteria (1) through (8), was submitted before the Board. Clearly this time period exceeded the allowable twenty-day decision requirement and constitutes error.

Pointing to the language of 10 V.S.A. § 6089(c), the various appellees contend, however, that objection was not properly entered before the Board so as to enable this Court to con-

sider the error. They argue further that, even if the issue were raised before the Board, Wildlife has shown no injury, nor in fact could it have made such a showing in light of its own actions below. In its proposed questions of law for certification to this Court, Wildlife did object to the Board's tardiness in issuing a decision on criteria (9) and (10). And, since this is not the type of error that could have been cured by the Board after proper and timely objection, mention thereof in the proposed questions for certification is sufficient, for purposes of § 6089 (c), to allow review here.

The twenty-day procedural requirement exists, in part, to protect an applicant from lengthy and costly consideration of criteria (1) through (8) that would be rendered unnecessary by a decision on criteria (9) and (10) adverse to an applicant. It is significant that applicant here chose to proceed at the District Commission level with hearings on criteria (1) through (8) some time before the Board issued its March 13 continuance and also opposed appellees' efforts at board level to stay any District Commission hearings on (1) through (8) until final decision could be had on criteria (9) and (10). By its actions, then, Wildlife has waived the protection of the twenty-day decision period requirement, and has not been prejudiced. We would pause to emphasize that, by this conclusion, we in no way condone the Board's failure to follow the dictates of § 6086(b), and similar error in some other administrative context might well constitute grounds for reversal.

## IV.

By motion before the Board, subsequently denied, Wildlife maintained that the various appellees lacked standing to be heard on appeal from the District Commission. On appeal here, Wildlife objects anew to the presence of the Agency of Environmental Conservation, arguing that the Agency is not an appropriate party to adjudicatory proceedings within itself. Its challenges to the presence of the towns of Mount Holly and Weston Planning Commissions, and the adjacent property owner, William Marshall, rest on a claimed failure of these appellees to appear and participate before the District Commission, thus precluding their participation in Board hearings.

■ The participation of the Agency as a party before the Board was entirely proper. 10 V.S.A. § 6084(b) provides that the District Commission shall forward notice of the filing of an Act 250 permit application to any State agency directly affected, and parties to District Commission proceedings are, *inter alios,* those who have received notice. 10 V.S.A. § 6085(c). And, for purposes of appeal to the Board, a State agency shall be considered a party. *Id.*

But even granting this permitted presence before the Board, Wildlife suggests that the statutory scheme, in effect, allows the Agency to be at once both judge and litigant in Act 250 hearings. However, there is a distinct difference between the Environmental Board and the Agency of Environmental Conservation, of which the Board is only a part. 3 V.S.A. § 2802(a)(3). No apparent conflict of interest exists, since the Agency has no adjudicatory powers under Act 250 and the Secretary of the Agency neither appoints, nor controls the Board. 10 V.S.A. § 6021(a). Furthermore, Wildlife has pointed to no instances in the record where the Agency strayed into a dual role of judge and litigant. We have previously stated that we will not search the record for error when not adequately briefed or referenced. *In re Wright,* 131 Vt. 473, 310 A.2d 1 (1973).

■ The Mount Holly and Weston Town Planning Commissions both appeared at the District Commission hearings on criteria (9) and (10), their presence as parties provided for in 10 V.S.A. § 6084(a) and § 6085(c). Wildlife questions the standing of the planning commissions at board level because they failed to appear at District Commission hearings on criteria (1) through (8), at a time when the Board was considering either issuing a decision on the criteria (9) and (10) appeal or postponing a resolution pending an appeal on criteria (1) through (8). There is prejudice, Wildlife argues, when its case must be presented both at the commission level and before the Board, while application opponents need only once appear at the de novo Board appellate proceedings. But party standing and the de novo process in appeals before the Environmental Board were carefully explained and approved in *In re Preseault,* 130 Vt. 343, 292 A.2d 832 (1972):

> A *de novo* proceeding is one in which all the evidence is heard anew, and the probative effect thereof determined. A *de novo* proceeding contemplates those parties who had an interest in the original proceeding being allowed to appear and participate as proper parties at the second set of hearings. (Citations omitted.)

*Id.* at 348. Clearly the town planning commissions were parties with an interest before the District Commission during hearings on criteria (9) and (10), thus establishing standing on appeal. We find no mandate in Act 250, nor in *In re Preseault, supra,* that a party maintain a perfect attendance record at the District Commission hearings, or else thereafter be barred from further appellate participation.

The standing and status of William Marshall, an adjoining landowner to the proposed development, is a somewhat different question. As previously stated, Wildlife had challenged the standing of all the appellees for failure to appear and participate in District Commission hearings. But the record leaves no doubt that Marshall did in fact participate at the District Commission proceedings, was granted party status by the Board and was an appellee before this Court. However, the statutory amendment to 10 V.S.A. § 6085(c) carefully delineates the extent of an adjoining property owner's role in later Act 250 proceedings and the limits of that role were exceeded in the appeal to the Board and to this Court.

■ *In re Preseault, supra,* had interpreted the original § 6085(c) to give party status to an adjoining property owner in the de novo appeal to the Environmental Board. But the new § 6085(c), amended since the *Preseault* decision, carefully omits the adjoining property owner from the list of those possessing party status on appeal and allows the property owner to only

> participate in hearings and present evidence only to the extent the proposed development . . . will have a direct effect on his property under section 6086(a)(1) through (a)(10) of [Title 10].

His role is as a permitted participator, not a party; the extent of his participation is specifically limited. Furthermore, lack-

ing party status, the adjoining property owner cannot take an appeal to this Court, 10 V.S.A. § 6089(b). It therefore follows that Marshall's participation in briefing and argument before this Court was inappropriate, and consequently, has had no influence on our rendered decision.

## V.

Finally, Wildlife alleges that the Board exceeded its jurisdiction by considering ten enumerated matters in its findings, ranging from animal disease control, to tourist volume statistics, to perimeter fencing. The short answer to this charge is that, even assuming error was committed when the Board considered some, or all of the allegedly improper matters, Wildlife has failed to show prejudice, which it has the burden of doing.

We would also point out that no application can properly be denied by the Board "unless it finds the proposed . . . development detrimental to the public health, safety or general welfare." 10 V.S.A. § 6087(a). To arrive at this finding, processing a permit application first involves consideration by the Board of the ten criteria of 10 V.S.A. § 6086(a), each of which involve myriad subcategories of concern. While one or two comments in the Board's findings, such as speculation regarding the eligibility of adjacent lands for wilderness area classification, may have been misguided, no reversible error has been made to appear. Support for the Board's conclusion that it is reasonably probable that the development will result in undue water pollution, unreasonable soil erosion, and reduction in the capacity of land to hold water, and that the proposed development will be detrimental to the public health, safety, or welfare, goes far beyond isolated improper considerations by the Board and is amply and satisfactorily provided by the record as a whole.

Wildlife has also challenged the Board's finding that the development will have an undue adverse effect on the scenic, natural beauty and aesthetics of the area, 10 V.S.A. § 6086 (a) (8); that § 6086(a) (8) is unconstitutional because it embodies a delegation of legislative power to an administrative agency without adequate standards and authorizes a taking of property without compensation; and that the conclusions

and findings of the Board that the development will unnecessarily and unreasonably endanger the public investment in public lands and will materially interfere with the public's use and enjoyment of public lands constitute a taking of property without compensation. Although the issues raised by these latter claims have been argued and briefed, they are constitutional in nature and will not be considered by this Court, unless the disposition of the case requires it. *Eurich* v. *Coffee-Rich, Inc.*, 130 Vt. 537, 544, 298 A.2d 846 (1972).

■ Our decision to affirm the denial of Wildlife's land permit application rests on the fact that there exists substantial and relevant evidence in the record to support the findings and conclusions that, were the game farm to be constructed, a reasonable probability would exist that undue water pollution, unreasonable soil erosion, and reduction in capacity of the land to hold water would result. The statutory scheme is constructed so that applicant's failure to satisfy his burden of proof on either the air and water pollution, or soil erosion, criterion results in a denial of a permit. 10 V.S.A. § 6086(a) and 10 V.S.A. § 6088(a). Since the decision of the Environmental Board is affirmed on statutory grounds to which no constitutional challenges were made, we do not reach Wildlife's constitutional claims in this opinion. Our affirmance also renders unnecessary consideration of the issues in the cross-appeal filed by appellee town of Weston.

The preamble to 10 V.S.A. § 6001, et seq., Act 250, expresses a concern for the prevention of "usages of lands and the environment which may be destructive to the environment and which are not suitable to demands and needs of the people of the State of Vermont . . . ." The only usages to be permitted are those "not unduly detrimental to the environment, [and those that] will promote the general welfare through orderly growth and development . . . ." Findings and Declaration of Intent, 1969, No. 250 (Adj. Sess.), § 1, eff. April 4, 1970.

As written, the demands and needs of the people call for consideration equal to that given our most precious woodlands. And although the irreplaceable character of land and the beauty of a solitudinous area is important, so too is the general welfare of the people which may beckon for another use. It is the uneasy duty of the Environmental Board to consider all

elements set forth in the statutes, weigh them and make an impartial decision. We cannot say that this was not done here.

*The order of the Environmental Board denying the application of Wildlife Wonderland, Inc. for a land use permit is affirmed. The Environmental Board's conclusion relating to air pollution is stricken.*

**Larrow, J.** (concurring in result). I concur generally with the views expressed in the majority opinion, and with the entry order reflecting those views. Although I am not completely convinced that the permit granted by the District Commission received the same impartial review by the Environmental Board that it would have received in Superior Court, this is probably not completely curable where an agency is a party to hearings before a board under its own jurisdiction. And, as the majority points out, we have no obligation to search the record for errors not adequately briefed or referenced.

I would go further, however, than the majority does in striking down the Board's conclusion of undue air pollution on procedural grounds, although I agree those grounds are valid. We will undoubtedly be faced again with the general issue here presented, in other cases if not in this one, since as I read the findings, the Board considers itself justified in refusing a permit when air contamination will result from the emissions of customer automobiles coming to the proposed project.

Unreasonable highway congestion from a development is a ground for permit refusal, with the burden of proof as to this issue on the objectors. 10 V.S.A. § 6085(a)(5); 10 V.S.A. § 6088(b). Air pollution is a similar ground, with the burden of proof on the applicant. 10 V.S.A. § 6085(a)(1); 10 V.S.A. § 6088(a). Standards for automobile exhaust emissions are, however, entrusted by statute to the Secretary of Environmental Conservation and the Department of Motor Vehicles. 10 V.S.A. § 567. The Environmental Board evidently construes its powers as broad enough to prohibit operation of motor vehicles in the vicinity of a proposed development even though they are equipped with all required emission devices. If, sub silentio, the majority opinion concurs in this view, I would

522

disagree, even though concurring in the result reached. The "unreasonable highway congestion" made a statutory ground for permit rejection does not, in my view, encompass auto emissions as well as traffic movement. This is important, because undue air pollution, standing alone, can justify permit refusal, but unreasonable highway congestion, standing alone, cannot. 10 V.S.A. § 6087(b). The undue air pollution which justifies permit refusal must come, in my opinion, from the project, and not just from traffic approaching it. One small donkey engine was found below to be the only air pollutant source involved in the development itself, and I would hold as a matter of law that the applicant had sustained its burden as to undue air pollution.

I am authorized to state that Mr. Justice Billings concurs in this opinion.