**Herald Association, Inc. and McClure Newspapers, Inc. v. Honorable George F. Ellison and Rutland Superior Court**

[419 A.2d 323]

No. 34-80

Present: Barney, C.J., Daley, Billings and Hill, JJ., and Valente, Superior Judge, Specially Assigned

Opinion Filed July 29, 1980

*Gravel, Shea & Wright, Ltd., Robert B. Hemley* (On the Memorandum), Burlington, for Petitioners.

*Miller, Norton & Cleary,* Rutland, for Respondent Morgan.

**Barney, C.J.** This petition for extraordinary relief arises from the exclusion of the news media and the general public from a pretrial hearing in *State* v. *Bernard R. Morgan, Jr.,* Docket No. S3-79Rcr. The case prompted considerable press attention, presumably because the defendant was accused of assaulting an assistant judge of the Rutland Superior Court. The defendant moved to suppress certain statements alleged to have been made in violation of his constitutional rights. He also moved for closure of the suppression hearing on the ground that, should the statements be ruled inadmissible, widespread public knowledge of their contents would jeopardize his right to a fair trial. The prosecutor did not join in the motion, but did not oppose it.

At the time of the motion, an intern reporter for the Herald Association, a petitioner here, was present and voiced opposition to the proposed closure. The court entered a closure order and heard, in camera, the first witness in the suppression hearing. It then recessed the hearing to a later date. Before the suppression hearing was resumed, the Herald Association

and McClure Newspapers petitioned to vacate the closure order.

The court refused to vacate its order, ultimately held the rest of the suppression hearing in camera, and directed that the transcript of the hearing be sealed until after a jury for trial was empaneled.

So matters stood when the instant petition was filed in this Court. The records in the *Morgan* case, of which we take judicial notice, see *Weiner* v. *Prudential Insurance Co. of America*, 110 Vt. 22, 27, 1 A.2d 708, 710 (1938), reveal that, since that time, the suppression motion has been denied, the defendant has elected not to stand trial and has entered a plea and been sentenced. This has had the presumably unintended effect of precluding the very event which was to have triggered public access to the substance of the hearing in the form of release of the transcript on empanelment of a jury.

■ Although events have, on this occasion, outrun the full range of possible relief, the petitioners by seeking extraordinary relief have employed a proper legal vehicle for review of the order in question. V.R.A.P. 21. See *In re Rhodes*, 131 Vt. 308, 310, 305 A.2d 591, 592 (1973); *Miner* v. *District Court*, 136 Vt. 426, 428–29, 392 A.2d 390, 392 (1978). While such collateral proceedings are appropriate, we do not countenance any implication that nonparties can without authority in law be allowed any legal status within a pending criminal prosecution.

This petition brings before us the complex and unsettled fair trial-free press issues so recently addressed by the United States Supreme Court in *Gannett Co.* v. *DePasquale*, 443 U.S. 368 (1979), and in *Richmond Newspapers, Inc.* v. *Virginia*, 100 S. Ct. 2814 (1980). The *Gannett* majority reiterated that adverse publicity may endanger a defendant's right to a fair trial. *Gannett Co.* v. *DePasquale, supra,* at 378–79. It indicated that the Sixth Amendment right to a public trial is personal to the accused, *id.* at 379–87, and that, in any case, such a right would not confer a right of access to pretrial proceedings. *Id.* at 387–91. Finally the majority expressly reserved the question whether the First and Fourteenth Amendments conferred on the public a right of access to criminal proceedings and held that even if such a right did exist, it did not prohibit the

pretrial closure at issue because the trial court struck a proper balance between such a right and the defendant's right to a fair trial. *Id.* at 391–93.

We begin our analysis of this case with the simple proposition that *Gannett* does not authoritatively sanction this closure order. As we noted above, it does not appear that the superior court intended that this order become a permanent bar. By its terms, the transcript was to be open after jury drawing was completed. Yet the criminal prosecution of Bernard Morgan has been completed and the transcript remains sealed. Intent aside, it appears that the effect of the order is now permanent in nature. We must measure its validity based on its actual, not its intended, impact.

The permanent nature of this order distinguishes it in a critical aspect from the relief approved in *Gannett*. There, in determining that the trial court properly balanced the defendant's rights against any First Amendment right of access in the public, Justice Stewart rested on the temporary nature of the closure order involved:

> Furthermore, any denial of access in this case was not absolute but only temporary. Once the danger of prejudice had dissipated, a transcript of the suppression hearing was made available. The press and the public then had a full opportunity to scrutinize the suppression hearing. Unlike the case of an absolute ban on access, therefore, the press here had the opportunity to inform the public of the details of the pretrial hearing accurately and completely. Under these circumstances, any First and Fourteenth Amendment right of the petitioner to attend a criminal trial was not violated.

*Id.* at 393 (footnote omitted). In this respect this order, in its present form, presents a different and deeper challenge to the First Amendment interests at stake.

■ Because of the fragmentation of the Court and because of the reservation of the First Amendment issue, *Gannett* left the fair trial-free press controversy almost as unsettled as it found it. *Richmond Newspapers, supra,* provides some additional guidance. It held that there is a First Amendment right to attend criminal trials. *Id.* at 2829. While the decision does

not expressly determine whether any such right of access applies to pretrial hearings, it would seem fair to infer that it does. On the other hand, mere recognition of a First Amendment right of access to judicial proceedings does not demand that this order be vacated. Even as to trials, the right to recognize is not an absolute one, *id.* at 2830 n.18, but rather a right to be weighed against other interests. *Id.* at 2830 and n.18; 2834 (Brennan, J., concurring) ("An assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded."). Moreover, the interests supporting closure have greater force as to pretrial hearings than as to trials because of the need, among other concerns, to prevent the "dissemination of suppressible prejudicial evidence to the public before the jury pool has become, in a practical sense, finite and subject to sequestration." *Id.* at 2839 n.25 (Brennan, J., concurring).

Our case then, while similar to both *Gannett* and *Richmond Newspapers,* lies between the two holdings. It seems that the First Amendment is implicated by this order, but the decisions of the final constitutional arbiter, the United States Supreme Court, do not clearly determine whether this closure violates the First Amendment.

In the face of such uncertainty, the wisdom of our traditional rule of self-restraint—that we do not needlessly decide constitutional issues, e.g., *In re Wildlife Wonderland, Inc.,* 133 Vt. 507, 519–20, 346 A.2d 645, 653 (1975); *State* v. *LaPlaca,* 126 Vt. 171, 176, 224 A.2d 911, 915 (1966); *Hanley* v. *United Steel Workers of America,* 119 Vt. 187, 193, 122 A.2d 872, 876 (1956)—is all the more apparent. We would not wish to inadvertently infringe upon any right of access nor deny any defendant the full measure of his right to a fair trial. Of course, given a case in which a determination of the issues presented demands that this Court decide such questions, it would be our duty to do so. But this is not such a case.

Leaving aside for the moment constitutional concerns, we note that in this state public judicial proceedings are the rule and closed ones the exception. See *Sunday* v. *Stratton Corp.,* 136 Vt. 293, 305–06, 390 A.2d 398, 405 (1978). Where closed proceedings have occurred they have ordinarily had specific

statutory authorization. E.g., 12 V.S.A. § 1901 (obscene or scandalous causes); 33 V.S.A. § 651(c) (juvenile proceedings); 13 V.S.A. § 5131 (criminal inquests).

Because the undetermined scope of constitutional rights is implicated and because our own state policy of open judicial proceedings is thereby contravened, any pretrial closure order imposed in this jurisdiction must be based on a clear necessity for the protection of the defendant's fair trial rights and must be limited in scope by its justification. A trial court facing a closure motion must therefore consider and make use of the numerous procedural devices with which a defendant's right to a fair trial can be protected without ordering a closure. They include "continuance, severance, change of venue, change of venire, *voir dire*, peremptory challenges, sequestration, and admonition of the jury." *Gannett, supra,* at 441 (Blackmun, J., concurring in part and dissenting in part) (citing ABA Project on Standards for Criminal Justice, Fair Trial and Free Press, Standard 8-3.2, at 16 (App. Draft 1978); *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 562–65 (1976); and *Sheppard v. Maxwell,* 384 U.S. 333, 354 n.9, 358–62 (1966)).

We note that not all of these devices are well suited to every case. Change of venue, for example, is frequently referred to as a ready expedient for avoiding prejudicial publicity problems. However, it is a remedy which should not lightly be resorted to. Quite apart from the added expense to the state and the taxpayers, and the burden and inconvenience to trial participants which it causes, a venue change erodes, at least in spirit, the defendant's right to trial "by an impartial jury of the country." Vt. Const. ch. I, art. 10. That provision is some recognition of a common law right to be tried locally, and has legislative implementation in our venue statutes. See, e.g., *State v. Murphy,* 134 Vt. 106, 108–09, 353 A.2d 346, 348–49 (1976); *State v. Brown,* 103 Vt. 312, 154 A. 579 (1931); 13 V.S.A. §§ 4601–4638.

Measuring the closure order challenged here against the two considerations outlined above, it is clear that the order cannot stand. Even assuming that some sort of closure order was justified in the circumstances, a question which we do not

decide, the order imposed must be vacated because it extends beyond the justification for its imposition. Certainly, now that Bernard Morgan has pleaded guilty and been sentenced, he no longer has a fair trial interest worthy of protection by closure of the record of his pretrial suppression hearing. Yet, as we have noted above, the transcript of that hearing is still sealed. At least in this respect, the order is improper.

*The January 17, 1980, order of the Rutland Superior Court sealing the transcript of the suppression hearing in State v. Bernard R. Morgan, Jr., Docket No. S3-79Rcr is vacated. The transcript is declared a public record.*

Billings, J., concurring. I agree with the result reached by the majority in this case, but I do so on different grounds than those of the majority opinion. My reading of *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979), which held that the Sixth Amendment to the United States Constitution does not guarantee public access to certain pretrial hearings where the defendant, prosecution and court concur in closure, and the cases of *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *In re Oliver*, 333 U.S. 257 (1948); and *Near v. Minnesota*, 283 U.S. 697 (1931), has been that the Supreme Court would be inclined to hold in the proper case that the First Amendment to the United States Constitution guarantees such access. I find support for this inclination in *Gannett Co. v. DePasquale, supra,* at 380, 383, 385, 391–94, 397–403 (Powell, J., concurring); 411, 413 n.2, 418–48 (Blackmun, J., concurring and dissenting), although the issue was not decided there, *id.* at 411. My view has been confirmed in part by the recent case of *Richmond Newspapers, Inc. v. Virginia*, 100 S. Ct. 2814 (1980).

In *Richmond Newspapers*, the Court held that the First Amendment to the United States Constitution guarantees, although not absolutely, public access to criminal trials. *Id.* at 2830. While the plurality opinion of the Chief Justice in *Richmond Newspapers* appears to invoke "a veritable potpourri" of constitutional sources for the holding, including the free speech, free press, and assembly clauses of the First Amendment and the Ninth Amendment, *id.* at 2842 (Black-

mun, J., concurring), I find the succinct invocation by Justice Brennan of the free speech clause and its historical background and role in a republican system of self-government fully adequate for the disposition of this case. It is clear to me that the structural role of the clause is the safeguarding of vigorous public debate on issues of public importance, see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at 270, and that such a safeguard carries with it the requirement that the public be permitted access to information on matters of public concern. *Richmond Newspapers, Inc.* v. *Virginia, supra,* 100 S. Ct. at 2832 (Brennan, J., concurring). Certainly, the application at a pretrial hearing of the Constitution to evidence admissible in a criminal trial is a subject of public concern, for it concerns the relationship of the state and individual, and the nature of the judicial process—issues of preeminent significance in the debate which ensures the vitality of our society and government.

While it may be suggested that *Richmond Newspapers* does not extend its rule to pretrial hearings, to which *Gannett* held the public is not guaranteed access under the Sixth Amendment, I find this most unlikely. Although the Chief Justice has attempted to distinguish *Richmond Newspapers* from *Gannett* on the ground that the latter applied only to pretrial hearings, *Richmond Newspapers, Inc.* v. *Virginia, supra,* 100 S. Ct. at 2821, such a distinction is facile, see *id.* at 2840 (Blackmun, J., concurring). After *Richmond Newspapers,* the "ultimate ruling in *Gannett* . . . is now to the effect that there is no *Sixth* Amendment right on the part of the public—or the press—to an open hearing on a motion to suppress." *Id.* at 2842 (Blackmun, J., concurring).

It is inconsistent with *Richmond Newspapers* and not required by *Gannett* to conclude in the instant case that there is or may not be a First Amendment right of public access to pretrial motions hearings. The court below having found no facts giving rise to any basis for qualifying the public's right of access, the court's order closing the hearing and record was clear error.

**Hill, J.,** concurring in part and dissenting in part. I concur in the majority's opinion insofar as it grants access to the

transcript of the suppression hearing, but dissent from it in every other respect.

## I.

Initially, I take issue with the majority's cursory review of the facts, for I do not believe that it accurately reflects what transpired in the present case. I attempt to supply the critical yet missing facts.

First, on October 30, 1979, when the information charging Bernard R. Morgan was filed in the Rutland Superior Court, it was accompanied by an affidavit of a deputy state's attorney. The affidavit contained an account of the events that transpired on the day of the alleged crimes, two eyewitness identifications of the accused, several statements made by potential trial witnesses that tended to inculpate him, and the recitation of incriminating statements that the witnesses attributed to him. Both the information and the affidavit became part of the public record on file at the Rutland Superior Court and continued to be open to the public until January 4, 1980, when the affidavit was sealed as a result of the superior court's closure order. It was this affidavit that contained many of the statements which Morgan sought to suppress and that provided the information for the newsstories which purportedly resulted in defendant's closure motion.

Second, the press attention that Morgan claimed would prevent him from receiving a fair trial, and that the majority characterizes as "considerable," consisted, so far as the record shows, of seven newsstories over the course of two months. Furthermore, the newsstories consisted almost entirely of straightforward reporting of the facts surrounding Morgan's arrest and the condition of the victim. There was not even a tinge of sensationalism in any of the articles. See Rutland Daily Herald, October 29, 1979, at 15, col. 6; id., October 30, 1979, at 9, col. 3; id., October 31, 1979, at 13, col. 5; id., November 1, 1979, at 17, col. 1; id., November 15, 1979, at 26, col. 2; id., January 4, 1980, at 11, col. 1; id., January 5, 1980, at 1, col. 1.

This was the state of the case when the trial court granted defendant's unopposed motion to close. Petitioners then commenced the present proceeding, challenging the order of the superior court as being in-violation of the First and Sixth

Amendments to the United States Constitution, as applicable to the states through the Fourteenth Amendment.

## II.

The issue with which we are presented today, while new to this Court, was recently addressed by the United States Supreme Court in *Gannett Co.* v. *DePasquale,* 443 U.S. 368 (1979). In that case, the Supreme Court held, by a 5–4 majority, that the Sixth Amendment to the United States Constitution does not bar the closing of a pretrial suppression hearing to the public and the press where both the judge and the prosecutor acquiesce, and a public proceeding would jeopardize a defendant's right to a fair trial. Writing for a majority of the Court, Justice Stewart stated that the Sixth Amendment guarantee of a public trial "is personal to the accused," and does not embrace "any right of access to a criminal trial on the part of the public." *Id.* at 379–80.

Whether the press and the public have a First Amendment right of access to information, however, was expressly reserved by seven members of the Court. *Id.* at 392; *id.* at 447. Only two justices squarely addressed the issue, and they came to opposite conclusions. *Id.* at 397 (Powell, J., concurring, finding First Amendment right); *id.* at 404–06 (Rehnquist, J., concurring, finding no First Amendment right).

In the case at bar, although the First Amendment issue was squarely raised, the majority goes to great pains to skirt it. I am unwilling, however, to avoid deciding issues squarely raised and necessary to the determination of a particular case in the guise of "not needlessly decid[ing] constitutional issues," when I believe that that traditional rule is being misused merely to avoid resolving a controversial issue.

It is my opinion that the First Amendment does confer a right of public access, though not absolute, to judicial proceedings. A core objective of the First Amendment is to ensure that there is a full and free flow of information to the general public, so that an informed citizenry can responsibly exercise those rights essential to the success of our system of government. See *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 269–79 (1964). Foremost among those fundamental rights is the right freely to discuss and scrutinize the affairs of govern-

ment, especially the manner in which our criminal justice system is conducted.

> What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs. No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny. . . . It embodies our Nation's commitment to popular self-determination and our abiding faith that the surest course for developing sound [governmental] policy lies in a free exchange of views on public issues. And public debate must not only be unfettered; it must also be informed.

*Saxbe* v. *Washington Post Co.*, 417 U.S. 843, 862–63 (1974) (Powell, J., dissenting). See *New York Times Co.* v. *Sullivan, supra.* See also *Maryland* v. *Baltimore Radio Show, Inc.*, 338 U.S. 912, 920 (1950) (opinion of Frankfurter, J., respecting denial of certiorari) ("One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right.").

Only recently this Court had the occasion in a civil case to comment on our judicial system's antipathy toward secret judicial proceedings. In *Sunday* v. *Stratton Corp.*, 136 Vt. 293, 390 A.2d 398 (1978), the Court was confronted with a claim that the trial court erred by denying a request to hold the hearing on a motion for a directed verdict outside the presence of the public and the press. Writing for the Court, Mr. Justice Larrow pointed out that closed proceedings are "the exception rather than the rule," *id.* at 306, 390 A.2d at 405, and he explicitly adopted the following language from Mr. Justice Brennan's concurring opinion in *Nebraska Press Association* v. *Stuart*, 427 U.S. 539, 587 (1976):

> Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of

the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability.

*Sunday* v. *Stratton Corp., supra.*[1] See also *Gannett Co.* v. *DePasquale, supra,* 443 U.S. at 428–29 (Blackmun, J., concurring and dissenting); *United States* v. *Cianfrani,* 573 F.2d 835, 851 (3d Cir. 1978).

Among the many beneficial effects that are brought to bear by the right to know what transpires at judicial proceedings are "[t]he protection against perjury which publicity provides, and the opportunity publicity offers to unknown witnesses to make themselves known" to the court. *Gannett Co.* v. *DePasquale, supra,* 443 U.S. at 427 (Blackmun, J., concurring and dissenting). Furthermore, open proceedings serve "to protect [the] accused from the abuses to which secret tribunals would be prone," as well as to ensure that no defendant benefits "from the partiality of a corrupt, biased, or incompetent judge." *Id.* at 428. In short, public proceedings guarantee that the probity of the judicial process is maintained, and that the officials entrusted with the public's confidence carry out their duties in a conscientious and trustworthy manner.

Because the average citizen has neither the time nor the inclination to attend any or all of the multitude of judicial proceedings that take place within our state each day, it necessarily devolves on the press to provide the information that the public requires to discharge intelligently their political responsibilities. This is not to say, of course, that the press enjoys any right of access greater than the public at large, but rather that in ferretting out the news the press acts as agents for the populace. *Id.* at 397–98 (Powell, J., concurring); *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469, 495 (1975).

As I stated above, the right of access guaranteed to both the public and the press is not absolute. There are a number of

---

[1] The majority opinion cites *Sunday* as embodying a mere policy in favor of open judicial proceedings. I find it impossible, however, to so facilely pass off the constitutional underpinnings of that case, especially in light of the fact that Mr. Justice Brennan's opinion in *Nebraska Press Association* v. *Stuart, supra,* was grounded on none other than the First Amendment.

instances where courts confronted with delineating the bounds of such a right of access have held that sufficiently compelling reasons may exist for closing a proceeding. See, e.g., *Gannett Co.* v. *DePasquale, supra,* 443 U.S. at 397 n.1 (Powell, J., concurring) (grand jury proceedings); *Illinois* v. *Allen,* 397 U.S. 337, 343 (1970) (necessary to preserve decorum); *United States* v. *Bell,* 464 F.2d 667 (2d Cir.), *cert. denied,* 409 U.S. 991 (1972) ("skyjacker profile"); *Geise* v. *United States,* 262 F.2d 151 (9th Cir. 1958) (testimony of young complainant in rape prosecution); *Westchester Rockland Newspapers, Inc.* v. *Leggett,* 48 N.Y.2d 430, 453 n.3, 399 N.E.2d 518, 532 n.3, 423 N.Y.S.2d 630, 644 n.3 (1979) (Fuchsberg, J., concurring) (deliberations of judge and jury); *Philadelphia Newspapers, Inc.* v. *Jerome,* 478 Pa. 484, 509, 387 A.2d 425, 437 (1978) (sidebar and bench conferences); *Williams* v. *Stafford,* 589 P.2d 322, 330 (Wyo. 1979) (Raper, C.J., dissenting) (juvenile cases). See generally Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv. L. Rev. 1899 (1978). The full range of such possible exceptions need not be delineated here, however, for the issue presented today involves only the situation where the public's and the press' right of access is sought to be curtailed based on the concern that open proceedings would result in prejudicial publicity, thereby impinging on a defendant's right to a fair trial.

I believe that in the great majority of cases it would be possible for the trial court to accommodate the public's constitutional right of access with a criminal defendant's constitutional right to a fair trial. The court's determination would of necessity require the judge to measure the potential prejudicial effect that the claimed publicity, both that already released and that yet to come, will have on the ultimate trial. To aid a judge having to make this accommodation, I would provide the following guidelines, which generally follow the standards proposed by the American Bar Association, ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Standard 8-3.2 (App. Draft 1978), and adopted by the great majority of courts that have considered the issue. See, e.g., *Northwest Publications, Inc.* v. *Anderson,* — Minn. —, 259 N.W.2d 254 (1977); *Keene Publishing Corp.* v. *Cheshire County Superior Court,* 119 N.H. 710, 406

A.2d 137 (1979); *Detroit Free Press, Inc.* v. *Macomb Circuit Judge,* 405 Mich. 544, 275 N.W.2d 482 (1979); *State* v. *Allen,* 73 N.J. 132, 373 A.2d 377 (1977); *Westchester Rockland Newspapers, Inc.* v. *Leggett, supra,* 48 N.Y.2d 430, 399 N.E.2d 518, 423 N.Y.S.2d 630 (1979); *State ex rel. Dayton Newspapers, Inc.* v. *Phillips,* 46 Ohio St. 2d 457, 351 N.E.2d 127 (1976); *Rapid City Journal Co.* v. *Circuit Court,* 283 N.W.2d 563 (S.D. 1979); *Williams* v. *Stafford, supra,* 589 P.2d 322 (Wyo. 1979).

First, an accused who seeks closure must provide an adequate basis to support a finding that there is a substantial likelihood that his fair trial right will be irreparably damaged by holding a public proceeding. The accused must show, and the court must consider, the nature and extent of the publicity prior to the closure motion in order to reasonably project whether further coverage will result in the harm sought to be avoided. See *Gannett Co.* v. *DePasquale, supra,* 443 U.S. at 441 (Blackmun, J., concurring and dissenting).

Second, the accused must show a substantial likelihood that less restrictive alternatives to closure will not adequately protect the fairness of his trial. In adjudging whether an accused has made a sufficient showing on this point to warrant the extraordinary device of closure, a trial judge should at the very least consider the following alternatives: continuance, severance, change of venue, change of venire, voir dire, peremptory challenges, sequestration, and admonition of the jury. ABA Standards, *supra,* Standard 8-3.2 at 16 (App. Draft 1978); see *Nebraska Press Association* v. *Stuart, supra,* 427 U.S. at 562–65. A conclusion that closure is necessary because no less restrictive alternatives would be adequate must be supported by explicit findings made on the record. Furthermore, in the case of suppression hearings of the nature involved here, which most often address the circumstances surrounding the obtainment of a confession rather than its substance, a carefully conducted hearing could be had in public with a minimum risk that prejudicial information would be disclosed. See *Gannett Co.* v. *DePasquale, supra,* 443 U.S. at 442 (Blackmun, J., concurring and dissenting).

Third, the accused must establish that there is a substantial likelihood that closure will be effective in guarding against the

perceived harm. Where, as here, substantial prejudicial information has already been made public, it is doubtful that closure would be efficacious, for at the most closure serves only to preclude access to information, not to eradicate information already within the knowledge of the public. *Id.*

Lastly, before any person is asked to leave the courtroom, he must be given the opportunity to briefly and informally state his objections on the record. This is not to say, of course, that the public must be given prior notice of the motion or the hearing. *Id.* at 445–46. Similarly, if a person is subsequently denied access to a sealed record, he must be given the opportunity to raise his objections.

The balancing of potentially conflicting constitutional rights requires the utmost care, for no person should be forced to relinquish his or her cherished rights. The guidelines that I propose would serve to accommodate both the rights of the criminal defendant and the rights of the press and public in the overwhelming majority of cases. If, however, the extraordinary case which requires restrictions on access should arise, those restrictions should extend no further than the circumstances reasonably require. *Id.* at 444–45. It must be remembered that the general rule is that judicial proceedings should be held in open court. See *Sunday* v. *Stratton Corp., supra,* 136 Vt. at 306, 390 A.2d at 405. Any departure from this rule must be based on an adequate showing by the defendant and a considered decision by the court. With this in mind, I now turn to the order in the present case.

### III.

I have carefully reviewed the record in this case, and I find it barren of any facts that would support the court's closure order. No factual inquiry was made into the nature or extent of the publicity that had been given the case up until the time the closure order was first imposed. At the hearing on the motion to vacate the court's closure order, the main thrust of the arguments related to the relevant legal theories, not to the potential impact of the publicity on the community. Furthermore, in considering whether less restrictive alternatives to closure would have sufficed, the lower court merely recited the options we suggested above, and dismissed them seriatim in conclusory terms, without ever making any findings of fact as

to why those alternatives would not have served to protect against the perceived harm. It is also highly questionable whether the closure order actually achieved its intended purpose, since most, if not all, of the prejudicial information to which the accused sought to restrict access was already in the hands of the public.

Even though the Court now appears to hold that the closure order in the present case was not properly imposed, it is not in a position to undo the damage that was done to the rights of the public and the press, since the closed proceeding has already been held. The irremediable nature of a closure order and the inadequacy of a transcript as a substitute for attendance at a hearing are two compelling reasons why I would stress forcefully the necessity for the trial court to marshal all the facts before attempting to make a judgment on an unopposed motion to close a judicial proceeding. The majority opinion, on the other hand, sees no difference between attendance at a hearing and having access to a transcript of that hearing at some later date. As a result, it fails to address the issue of whether the public and the press have a right of access to the hearing itself. It merely concludes that as between a right of access the public and press may or may not have, a question they do not decide, and a right to a fair trial that the defendant here no longer has because he has pled guilty, the former outweighs the latter. This resolves nothing.

In the later stages of our consideration of the present case the United States Supreme Court decided *Richmond Newspapers, Inc.* v. *Virginia,* 100 S. Ct. 2814 (1980). Contrary to the majority, who evidently have read that case with an eye more towards what it did not say than towards what it did say, I believe that case supports the conclusion that there is a First Amendment right of access to judicial proceedings in general. The reasons advanced by the various members of the Court in holding that there is a First Amendment right of access to trials are equally compelling in determining whether there is a First Amendment right of access to pretrial and other judicial proceedings. Furthermore, the First Amendment analysis relied on in *Richmond Newspapers* does not lend itself to the simple distinctions that the Sixth Amendment analysis relied on in *Gannett, supra,* does. Literally, the Sixth Amendment gives the accused a right to a "public trial." It does not, as

some members of the Court observed in *Gannett,* make any mention of pretrial proceedings. The First Amendment, on the other hand, contains no language upon which this distinction between trials and pretrial proceedings could be made. At the most, the type of proceeding to which access is sought is one factor to be taken into account in determining whether a defendant has shown such an overriding interest that the presumption of openness which attaches to judicial proceedings has been rebutted.