PATUXENT PUBLISHING CORPORATION ET AL. *v.*
STATE OF MARYLAND

[No. 216, September Term, 1981.]

*Per Curiam Order April 17, 1981.*

*Opinion Filed May 12, 1981.*

The cause was argued before MORTON, MOYLAN and COUCH, JJ.

*Theodore Sherbow* and *G. Stewart Webb, Jr.,* for appellants.

*Alfred L. Scanlan, Jr.,* and *Bernard Raum* for appellee.

· Moylan, J., delivered the opinion of the Court.

This expedited appeal does not involve the merits of the proposed "gag order" on the ultimate criminal trial undergirding these proceedings. It deals rather with the threshold issue of a "gag order" on the "gag order" hearing. It is our considered judgment, however, that the two postures are not significantly different in terms of the public's right to know as effectuated by the press's right to access. To the extent to which there is a right to know what goes on at a criminal trial, there is an equally vital right to know what goes on in a court proceeding that contemplates curtailing that right to know. The litigation of a First Amendment issue can be as sensitive a public concern as the litigation of a violation of the criminal law.

The predicate case involves a Howard County prosecution of Emerson Baxter and a co-defendant for an unusually heinous murder. Because of the fact that the trials of the two defendants will be severed and that information might well come out in the first trial which would be widely disseminated and would arguably impact upon the ensuing trial of the co-defendant, steps were undertaken to minimize the adverse publicity by minimizing, in various ways and measure not yet fully determined, the access of the public and the press to the first trial or to various stages thereof. Several closure orders, the merits of which are not before us, were promulgated by the Circuit Court for Howard County on March 20, 1981 and March 23, 1981. The intervenors, appellants here, representing the press, moved to vacate those orders. On April 16, 1981, the Circuit Court for Howard County scheduled a hearing on these motions to vacate the closure orders. Of immediate concern here is the decision of the Circuit Court for Howard County to close the courtroom to the public and the press when that hearing was to take place. Out of deference to the intervenors, the Circuit Court for Howard County postponed the contemplated hearing until Monday, April 20, 1981, giving this Court the

opportunity to convene a special panel and to hear this expedited appeal on Friday, April 17, 1981. We heard the appeal on that day and issued a per curiam order which read as follows:

> "This cause coming on for hearing before this Court and counsel having been heard and arguments considered,
>
> It is this 17th day of April 1981, by the Court of Special Appeals,
>
> ORDERED, that the order of the Circuit Court for Howard County of April 16, 1981, closing the courtroom to the public at the hearing scheduled for Monday, April 20, 1981, on the issue of vacating the order of the Circuit Court for Howard County of March 20, 1981 and March 23, 1981, be, and it is hereby, vacated; and,
>
> This vacating of the order generally shall not prejudice the right of any party at that hearing to request, at an appropriate time, a limited bench conference or a limited in-chambers discussion to prevent public disclosure of arguably sensitive and prejudicial evidence that might be the subject of immediate consideration of the motions to vacate. Opinion to follow. Mandate to issue forthwith."

This opinion follows that order by way of setting forth its rationale.

At the outset, it is important to identify the provenance of the public's right, as opposed to a defendant's right, here implicated. The Sixth Amendment right to a public trial is one that runs to the criminal defendant alone and not to the people. The majority opinion of Justice Stewart for the Supreme Court in *Gannett Co. v. DePasquale,* 443 U.S. 368, 387, 99 S. Ct. 2898, 61 L. Ed. 2d 608, 626 (1979), was absolutely clear in this regard: "The Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case." More recently, however, the Supreme Court in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S.

555, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980), recognized that there is a constitutional right of access running to the benefit of the public and the press, although that right is bottomed in the First Amendment rather than in the Sixth Amendment. Chief Justice Burger, speaking for the plurality, held, at 65 L. Ed. 2d 991-992:

> "We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'"

The best articulation of the new ground broken by the Supreme Court in *Richmond News* came in the concurring opinion of Justice Stevens at 65 L. Ed. 2d 993-994, emphasizing not simply the source of the right but the additional dimension that the right to disseminate news involves the right of access to that news:

> "This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever .... Today, however, for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgement of the freedoms of speech and of the press protected by the First Amendment."

Both *Richmond News* and *Gannett* make it clear that the First Amendment right of the public to know is not an absolute and may sometimes yield to the countervailing right of a defendant to be shielded from prejudicial publicity. They make it clear, however, that there is a heavy burden upon those who would abridge the First Amendment right to establish clearly upon the record a compelling need for such abridgement. They make it clear that before resorting to so

drastic a measure, that all lesser and alternative sanctions be explored, such as sanitizing voir dire examination, sequestration of juries, the continuation of a case to allow the immediate impact of publicity to abate, and the removal of a cause to a more remote trial forum. These alternative sanctions may, indeed, work some inconvenience and dislocation upon the parties (including criminal defendants) but are nonetheless, on balance, to be preferred to curtailing the First Amendment freedom of the press. The combination of *Gannett* and *Richmond News,* furthermore makes it clear that this required balancing of interests be undertaken with respect to pre-trial hearings as well as with respect to trials themselves. They make it clear that only so much First Amendment abridgement will be tolerated as is compellingly required. They make it clear that every possible step must be taken to minimize the abridgement.

It was, indeed, the overbreadth of the closure order that concerned us here. At any point where explicit reference to or narration of the allegedly heinous facts of this case should have become necessary, it may well have been appropriate, we indicated, for a brief bench conference or a brief in-chambers conference to have dealt with that sensitive passage *sotto voce.* The possible need for such a limited *cordon sanitaire,* however, by no means implies the necessity to declare the entire hearing off limits. There was no need to clap a "top secret" classification on the exploration of alternative sanctions and the argument as to their pros and cons. There was no reason to keep from the public the far-reaching legal discussion of fundamental constitutional issues such as the freedom of the press and the right to a fair trial. The closing of a court proceeding to the public is a drastic step and must not be resorted to lightly or overbroadly, even for the benevolent purpose of protecting a defendant's rights.

We add one further word of caution. It is, of course, commendable that judge and prosecutor be sensitive to a defendant's rights and that the prosecutor sometimes even join the defense attorney in agreeing to some limited closure. It is equally important to remember that there is a

counterpoint obligation as *Gannett Co. v. DiPasquale, supra,* reminded us, at 61 L. Ed. 2d 624, n.12:

> *"The responsibility of the prosecutor as a representative of the public surely encompasses a duty to protect the societal interest in an open trial.* But this responsibility also requires him to be sensitive to the due process rights of a defendant to a fair trial. A fortiori, *the trial judge has the same dual obligation."* (Emphasis supplied.)

We trust, moreover, that even under circumstances where some limited closure might be appropriate, the prosecuting attorney would never bend over so far backwards as to request closure absent an explicit request from the defendant himself. Such prosecutorial generosity might yield only, in the last analysis, a defendant's claim that his Sixth Amendment right to a public trial had been abridged and that he had never knowingly and voluntarily waived that right. If and when two constitutional rights are in collision, it is always the cautious course to let the defendant express his choice.