TIMOTHY JOSEPH BUZBEE v. JOURNAL
NEWSPAPERS, INC. ET AL.

[No. 2, September Term, 1983.]

*Per Curiam Order filed March 17, 1983.*

*Opinion filed September 13, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*Reginald W. Bours, III*, with whom were *John C. Monahan, Edward M. Ryan* and *Bours & Monahan* on the brief, for appellant.

*Michael S. Horne*, with whom were *Kevin Michael O'Connell, Tietz & O'Connell, Carol D. Weisman, Janet Milne, Gregory M. Schmidt, Covington & Burling, Warren S. Oliveri, Jr.,* and *King & Nordlinger* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

## PER CURIAM ORDER

For reasons to be stated in an opinion to be filed later, it is this 17th day of March, 1983

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Court of Special Appeals be, and it is hereby, affirmed with costs; and it is further

ORDERED that the mandate shall issue forthwith.

In these criminal cases the trial court, at the accused's request, ordered, *inter alia,* that its hearing on motions to suppress evidence would be closed to the public. The Court of Special Appeals vacated that order. *Journal Newspapers v. State,* 54 Md. App. 98, 456 A.2d 963 (1983). We affirmed by *per curiam* order with opinion to follow. In presenting below the reasons for affirmance we shall hold that the public's qualified right of access to criminal trials extends to pretrial judicial proceedings in criminal cases and that, on the record in the instant matter, that right is not outweighed by probable impairment of the accused's right to a fair trial.

Respondents respectively publish three newspapers, the *Montgomery Journal,* the *Sentinel,* and the *Washington Post.* They intervened in seven criminal cases pending in the Circuit Court for Montgomery County against the Petitioner, Timothy Joseph Buzbee (Buzbee). These interventions unsuccessfully opposed restrictions on access sought by Buzbee. By orders entered on February 16, 1983, the circuit court (1) excluded the public, including the press, from a hearing then scheduled for February 28, 1983, and later postponed to March 22, 1983, on Buzbee's motions to suppress certain evidence (the closure order), (2) enjoined certain classes of individuals from making extrajudicial statements concerning aspects of the criminal causes pending against Buzbee (the "gag" order), and (3) directed that certain court records be sealed, including affidavits filed in the District Court to support the issuance of warrants for Buzbee's arrest. Respondents' appeal to the Court of Special Appeals was accelerated. That court, by

orders of February 25 and March 1, 1983, and for reasons set forth in an opinion filed March 4, 1983, vacated the circuit court orders entered February 16, 1983. There was no stay of the Court of Special Appeals' orders so that the probable cause affidavits became available to Respondents. Buzbee applied to this Court for a writ of certiorari. His petition sought only reinstatement of the gag and closure orders. We granted the writ on March 9, 1983, and heard argument on March 17, 1983. By *per curiam* order issued that day, we affirmed the intermediate appellate court.

Between March 1981 and November 1982 sixteen separate rapes had been committed in the Aspen Hill area of Montgomery County. In each case the assailant was careful to conceal his identity. Similarity between the victims' general descriptions of their assailant and the similar modus operandi indicated that one individual might be responsible. The community became increasingly concerned because the "Aspen Hill rapist" remained at large, despite intensive police investigation, increased patrolling, and heightened citizen watchfulness. Indeed, 600 persons attended a community meeting on the subject in October 1982 where they were addressed by Bernard Crooke, the chief of the Montgomery County police. Each rape occurrence and the community and police response to the increasing number of such offenses were reported in the media. On November 5, 1982, Buzbee was arrested. That evening Chief Crooke held a press conference at the end of which, in response to a question, he referred to Buzbee as the Aspen Hill rapist.[1]

---

1. The general tone of police professionalism at the press conference is reflected in the description by Buzbee's counsel of the contents of a tape recording of the conference.

I think Chief [Crooke] made a valiant effort to be completely proper in what he said about the arrest of Mr. Buzbee. He repeatedly said that, "All I am saying is that there was probable cause to arrest and that there was sufficient information to cause arrest warrants to be issued. I am not going to discuss the evidence. Additional evidence will be presented to the Grand Jury, et cetera."

And the very last thing that he said at the press conference in response to a question, apparently from someone attending the press conference . . . . The very last thing he said was the comment,

Buzbee had been the subject of police surveillance for some time preceding his arrest under warrants in four cases, on charges including robbery, two rapes, and a "peeping Tom" trespass observed by the police on November 4, 1982. Media accounts of the arrest included Chief Crooke's reference to Buzbee as the Aspen Hill rapist. The accounts also gave Buzbee's background, that is, that he was 25 years of age, a surveyor, married, the father of two children, and a homeowner in a residential community in adjoining Frederick County. It was also reported that Buzbee had no criminal record and that two victims of the Aspen Hill rapist had been unable to identify Buzbee in a line-up following his arrest. The *Montgomery Journal* of November 8 did a background piece on the front page concerning Buzbee in which the lead sentence quoted friends and neighbors in describing Buzbee "as a friendly and polite family man who was 'straight as an arrow.' "

At a hearing in open court on November 8, 1982, Buzbee was denied bail. Based on matters disclosed in argument by the State's Attorney in opposition to any bail, the press reported that evidence against Buzbee included police observation of the "peeping Tom" trespass and that a credit card which had been taken from a rape victim had been found in Buzbee's desk at his place of employment when a search warrant was executed. The *Montgomery Journal* of November 9 also reported, based on an undisclosed source, that Buzbee had been seen by a coworker to have a collection of women's panties in a bag. Information received by the police to that effect does appear in a warrant affidavit which is now public.

Whatever evidence the State had that implicated Buzbee was presented to the Grand Jury which returned indict-

---

and the only comment that the press has reported, was the comment that the Montgomery County Police are responsible for the arrest of the Aspen Hill rapist. That was the very last statement in a 20-minute press conference.

And as the Court knows from the exhibits we have already in evidence, that is the statement that has been repeated again and again and again, virtually every time there is any coverage concerning the Buzbee case.

ments on November 19, 1982 in seven cases. The "peeping Tom" trespass case, which was tried in the District Court of Maryland on January 17, 1983, resulted in a conviction.

Buzbee filed two motions to suppress, one directed to the fruits of searches and the other to post-arrest, oral statements which the motions say are not a "confession as such." The record does not contain the supporting material for the issuance of the search warrants or an inventory of the items seized. Although it appears that the oral statements sought to be suppressed were recorded in notes taken by a police officer, a copy of which had subsequently been furnished to Buzbee's counsel in discovery, those notes are not in the record.

The hearing on Buzbee's applications for restrictive orders took place in two stages, first on January 20, 1983, before the Respondents intervened, and later on February 9, 1983, when the Respondents were heard in opposition. Some findings of fact were made from the bench during the earlier hearing. The trial court had no doubt "that there has been substantial publicity in this case," resulting from "a very obvious interest in a very serious neighborhood situation," and that "in a particular part of our Montgomery County community there was an overriding public interest in a series of events which allegedly occurred." It was found that while "there has been substantial publicity, I do not find that it has been so overriding as to in effect have crept into the minds of everyone in Montgomery County as to their having made a decision on this particular case or having been biased by it." The hearing then turned to a consideration of the features to be included in the court orders so as to limit their scope and duration.

On this appeal the fundamental question is whether the Respondents have any right to attend, and thereby to report on, a pretrial suppression hearing which the hearing court has ordered to be closed at the request of the accused. The Court of Special Appeals, citing its decision in *Patuxent Publishing Corp. v. State,* 48 Md. App. 689, 429 A.2d 554 (1981), started from the premise that a right of public access, based upon the First and Fourteenth Amendments to the

United States Constitution and on Article 40 of the Maryland Declaration of Rights, is applicable to pretrial proceedings in criminal cases.[2] The Supreme Court has discussed public access to judicial proceedings in three recent cases, which we reviewed in *News American v. State,* 294 Md. 30, 447 A.2d 1264 (1982). After *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) had held that a newspaper does not have a right, under the Sixth Amendment, to attend a pretrial suppression hearing which had been ordered closed at the defendant's request, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (plurality opinion) determined that a qualified right of access to trials of criminal cases is guaranteed to the public, including the press, by the First and Fourteenth Amendments to the United States Constitution. In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982), the Supreme Court held that a Massachusetts statute mandating closure of the trial during the testimony of a minor victim in cases involving certain sex offenses was violative of this qualified right of access. *News American v. State, supra,* presented a newspaper's assertions that there is a constitutional right of public access to statements that trial participants might desire to make, that court orders in two criminal cases restricting such comment were erroneously entered, and that the newspaper could intervene in the criminal causes for the limited purpose of asserting the claimed right of access. The merits of that controversy became moot during the pendency of the appeal; however, we held, because of the recurring nature of fair trial-free press controversies, that media intervention in a criminal case was permissible when it was limited to opposition to orders alleged to be impermissibly restrictive of the claimed public right.

---

**2.** Maryland Declaration of Rights, Article 40, reads:

That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.

Although the Supreme Court has not spoken directly on the subject, many courts now hold that the right of access which was derived from the First Amendment and applied to criminal trials in *Richmond Newspapers* applies as well to pretrial judicial proceedings in criminal cases. *See United States v. Chagra,* 701 F.2d 354 (5th Cir. 1983) (bail reduction hearing); *United States v. Brooklier,* 685 F.2d 1162 (9th Cir. 1982) (as to pretrial suppression hearings); *United States v. Criden,* 675 F.2d 550 (3rd Cir. 1982) (pretrial suppression and dismissal for entrapment hearings); *United States v. Pageau,* 526 F. Supp. 1221 (N.D.N.Y. 1981) (pretrial hearing on admissibility under evidence law); *United States v. Civella,* 493 F. Supp. 786 (W.D. Mo. 1980) (all pretrial hearings to be held in the case); *Star Journal Publishing Corp. v. County Court,* 197 Colo. 234, 591 P.2d 1028 (1979) (en banc) (preliminary hearing); *State v. Couture,* 37 Conn. Supp. 705, 435 A.2d 369 (1981) (pretrial suppression hearings); *State v. Burak,* 37 Conn. Supp. 627, 431 A.2d 1246 (1981) (pretrial hearing on motion *in limine); United States v. Edwards,* 430 A.2d 1321 (D.C. App. 1981), *cert. denied,* 455 U.S. 1022, 102 S. Ct. 1721, 72 L. Ed. 2d 141 (1982) (pretrial detention hearing); *State v. Williams,* 93 N.J. 39, 459 A.2d 641 (1983) (bail and probable cause hearings). At least one court has expressly adopted the standard proposed in August 1978 by the American Bar Association's Standing Committee on Association Standards for Criminal Justice which "'rests on sixth amendment grounds.'" *Kansas City Star Co. v. Fossey,* 230 Kan. 240, 248, 630 P.2d 1176, 1182 (1981). Courts of other states have held that provisions in their state constitutions dealing with public trials or open proceedings confer a right of access on the public to pretrial suppression hearings in criminal cases. *See R.W. Page Corp. v. Lumpkin,* 249 Ga. 576, 292 S.E.2d 815 (1982); *Iowa Freedom of Information Council v. Van Wifvat,* 328 N.W.2d 920 (Iowa 1983); *Ashland Publishing Co. v. Asbury,* 612 S.W.2d 749 (Ky. Ct. App. 1980); *State ex rel. Smith v. District Court,* Mont. , 654 P.2d 982 (1982); *Federated Publications, Inc. v. Kurtz,* 94 Wash. 2d 51, 615 P.2d 440 (1980); *State ex rel. Herald Mail Co. v.*

*Hamilton,* 267 S.E.2d 544 (W. Va. 1980). A public right of access has been predicated on the free speech provisions of the Constitutions of Texas and Virginia. *See Houston Chronicle Publishing Co. v. Shaver,* 630 S.W.2d 927 (Tex. Crim. App. 1982) (en banc) (mid-trial suppression hearing); *Richmond Newspapers, Inc. v. Commonwealth,* 222 Va. 574, 281 S.E.2d 915 (1981) (pretrial suppression and motion *in limine* hearings). New York's highest court has overturned orders closing pretrial competency hearings based on public policy as reflected in statutory and case law, without reaching the constitutional level. *See Westchester Rockland Newspapers, Inc. v. Leggett,* 48 N.Y.2d 430, 423 N.Y.S.2d 630, 399 N.E.2d 518 (1979). On the other hand, the Supreme Court of California has held that there is no public right of access under either the United States or California Constitutions, at least insofar as preliminary hearings are concerned. *See San Jose Mercury-News v. Municipal Court,* 30 Cal. 3d 498, 179 Cal. Rptr. 772, 638 P.2d 655 (1982).

We agree with the results in the majority of decisions cited above and the Court of Special Appeals' conclusions that there is a right of public access to pretrial hearings in criminal cases and that the right is predicated on the First and Fourteenth Amendments and on Article 40 of the Maryland Declaration of Rights. The most recent decision of the United States Supreme Court dealing with the right of public access to criminal trials, in which six justices joined in the opinion of the Court, is *Globe Newspaper Co. v. Superior Court, supra,* 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982). The Court there explained that the right of access to criminal trials is afforded protection by the First Amendment because of historical and institutional features of the criminal justice system which had been emphasized in *Richmond Newspapers.* A similar analysis yields First Amendment protection for pretrial judicial proceedings in criminal cases.

As to the first feature the Court in *Globe* stated that

the criminal trial historically has been open to the press and general public. "[A]t the time when our

organic laws were adopted, criminal trials both here and in England had long been presumptively open" [cit. om.]. And since that time, the presumption of openness has remained secure .... This uniform rule of openness has been viewed as significant in constitutional terms not only "because the Constitution carries the gloss of history," but also because "a tradition of accessibility implies the favorable judgment of experience." [cit. om.]. [457 U.S. at 605, 102 S. Ct. at 2619, 73 L. Ed. 2d at 256. (footnote omitted).]

The presumptive openness of pretrial proceedings in criminal cases does not carry centuries of tradition. Nevertheless, the judgment of experience in this country with respect to pretrial judicial proceedings in criminal cases is that they are presumptively open. The Supreme Court of New Jersey, in concluding that there is a First Amendment right of public access to pretrial criminal proceedings, stated that "[t]he near uniform practice in the federal and state court systems has been to conduct pretrial criminal proceedings in open court." *State v. Williams, supra,* 93 N.J. at 55, 459 A.2d at 649. (Footnote omitted). The statement is supported by references to statutory provisions in eight states,[3] rules of court in two states,[4] and court decisions in the federal system, in 19 states,[5] and in the District of Columbia. *Id.* at 55 n.5, 459 A.2d at 649-50 n.5.

The ABA Standards for Criminal Justice (2d ed. 1980) in Standard 8-3.2 recommend that "pretrial proceedings and their record shall be open to the public, including representatives of the news media," unless certain criteria for closure are met. Presumptive openness of all preliminary

---

**3.** Arkansas, California, Georgia, Indiana, Michigan, Nevada, New York, and Wisconsin.

**4.** Pennsylvania and New Jersey.

**5.** Arizona, Arkansas, Colorado, Connecticut, Florida, Hawaii, Indiana, Kentucky, Maryland (citing *Patuxent Publishing, supra),* New Hampshire, New York, Ohio, Pennsylvania, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming.

criminal proceedings is also the position taken by the Judicial Conference of the United States by its September 25, 1980 approval of the Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue. *See* 87 F.R.D. 519, 534-35 (1980). In Maryland, the practice has been that hearings on pretrial motions in criminal cases are presumptively open. The burden is upon the party seeking closure or some other restraint on public access to obtain an order of court so as to reverse the usual procedure and have the public excluded. *Patuxent Publishing Corp., supra,* embraced the view that, in light of *Richmond Newspapers,* the rule of openness for pretrial proceedings is rooted in the First Amendment and is not simply a matter of practice.

The second feature of the criminal justice system emphasized in *Richmond Newspapers* and identified in *Globe Newspaper Co.* as explaining why the First Amendment protects public access to criminal trials is that "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole." 457 U.S. at 606, 102 S. Ct. at 2620, 73 L. Ed. 2d at 256.

The Third Circuit in *United States v. Criden, supra,* 675 F.2d at 556, has summarized the institutional or systemic underpinnings of the *Richmond Newspapers* holding.

> The *Richmond Newspapers* Court found open court proceedings to be mandated by at least six societal interests. First, public access to criminal proceedings promotes informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. *See id.* at 572, 100 S.Ct. at 2825 (plurality opinion); *id.* at 584, 100 S.Ct. at 2831 (Stevens, J., concurring); *id.* at 595-96, 100 S.Ct. at 2838-39 (Brennan, J., concurring in the judgment). This public access, and the knowledge gained thereby, serve an important "educative" interest. *See id.* at 572, 100 S.Ct. at 2825 (plurality opinion). Second,

public access to criminal proceedings gives "the assurance that the proceedings were conducted fairly to all concerned" and promotes the public "perception of fairness." *Id.* at 569, 570, 100 S.Ct. at 2823, 2824 (plurality opinion). Public confidence in and respect for the judicial system can be achieved only by permitting full public view of the proceedings. *Id.* at 595, 100 S.Ct. at 2838 (Brennan, J., concurring in the judgment). Third, public access to criminal proceedings has a "significant community therapeutic value" because it provides an "outlet for community concern, hostility, and emotion." *Id.* at 570-71, 100 S.Ct. at 2824-25 (plurality opinion). Fourth, public access to criminal proceedings serves as a check on corrupt practices by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality. *See id.* at 569, 100 S.Ct. at 2823 (plurality opinion). Fifth, public access to criminal proceedings enhances the performance of all involved. *See id.* at 569 n.7, 100 S.Ct. at 2823 n.7 (plurality opinion). Finally, public access to criminal proceedings discourages perjury. *See id.* at 596-97, 100 S.Ct. at 2839-40 (Brennan, J., concurring in the judgment).

These reasons are just as forcefully applicable to pretrial hearings in criminal cases. Chief Justice Burger estimates that 85% of all criminal charges are resolved by guilty pleas. *Gannett, supra,* 443 U.S. at 397, 99 S. Ct. at 2914, 61 L. Ed. 2d at 632 (concurring opinion). The result is that

pretrial aspects of criminal prosecutions have become increasingly important in the modern administration of criminal justice. *See Coleman v. Alabama,* 399 *U.S.* 1, 90 *S.Ct.* 1999, 26 *L.Ed.* 2d 387 (1970) (counsel must be provided in all pretrial proceedings that are critical in the criminal prosecution). Court decisions protecting the constitutional rights of defendants have given rise to new pretrial proceedings that frequently have a major effect on

the outcome of a prosecution. *E.g., United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.* 2d 1149 (1967); *Miranda v. Arizona,* 384 *U.S.* 438, 86 *S.Ct.* 1602, 16 *L.Ed.* 2d 694 (1966); *Jackson v. Denno,* 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964); *State v. Driver,* 38 *N.J.* 255 (1962). As a result of these developments, proceedings in advance of trial are now of central importance in our system of criminal adjudication. [cit. om.]. [*State v. Williams, supra,* 93 N.J. at 54, 459 A.2d at 648.]

If members of the public are to be able to evaluate the work of trial judges, prosecutors, and public defenders in the criminal justice system, there must be access to pretrial proceedings which are the only proceedings had in the great mass of criminal causes. Indeed, because suppression hearings frequently draw into question the propriety of police conduct, the interest of the public in the conduct of the police reinforces the conclusion that public access to pretrial criminal proceedings ultimately is founded in the First Amendment.

The right of access is not absolute. *Globe Newspaper Co., supra,* 457 U.S. at 606, 102 S. Ct. at 2620, 73 L. Ed. 2d at 257. We pointed out in *News American v. State, supra,* 294 Md. at 39, 447 A.2d at 1268-69 that when the right of public access recognized in *Richmond Newspapers* is asserted in opposition to some interest of the State or of an accused, a balancing of factors is required in determining whether a restrictive order is to be issued. Where, as here, the interest of the defendant in a trial before an impartial jury is the interest asserted to support closure of the suppression hearing, the trial court is required to weigh the probability of prejudice to the defendant against the interest of the public in open proceedings.

Articulation of a standard expressing the required degree of probability has bedeviled courts and commentators. However, *Gannett,* the only Supreme Court decision to date which has dealt with the closure of a pretrial suppression hearing, approved a " 'reasonable probability of prejudice' "

standard. 443 U.S. at 393, 99 S. Ct. at 2912, 61 L. Ed. 2d at 629. That was the standard which the trial court in New York had applied when ordering closure of a suppression hearing. In affirming that order, the Court in *Gannett* assumed that there was a right of public access under the First and Fourteenth Amendments to pretrial proceedings and held that the assumed right had not been violated. If the trial court in *Gannett* had applied an unconstitutional standard, disposition of the First Amendment argument on an "assuming arguendo" basis would have been improper. *See also News American v. State, supra,* 294 Md. at 35-36, 447 A.2d at 1267.

One in the position of Buzbee, who has the burden of proving the reasonable probability that something will happen in the future, faces a difficult task. Obviously he must start from the known and convince the trial court to make findings of what will probably occur. A number of courts, when addressing this problem, have looked to the three aspects of probability enunciated by Justice Blackmun, with whom Justices Brennan, White, and Marshall joined, when concurring in part and dissenting in part, in *Gannett.*[6] The factors identified by Justice Blackmun are (1) "that irreparable damage to [the accused's] fair-trial right will result from conducting the proceeding in public," (2) "that alternatives to closure will not protect adequately [the accused's] right to a fair trial," and (3) "that closure will be effective in protecting against the perceived harm." 443 U.S. at 441-42, 99 S. Ct. at 2937, 61 L. Ed. 2d at 660-61. Among courts holding that the proponent of closure must show these three probabilities in order to overcome the public's right of access are: *United States v. Chagra; United States v. Brooklier; United States v. Civella; Iowa Freedom*

---

6. Justice Blackmun uses the modifier "substantial" to describe the degree of probability which he would require. It is likely that Justice Blackmun intended some quantum of probability higher than "reasonable." He preceded his list and description of factors by stating that "[i]t comports with the Sixth Amendment to require an accused who seeks closure to establish that it is strictly and inescapably necessary in order to protect the fair-trial guarantee." 443 U.S. at 440, 99 S. Ct. at 2936, 61 L. Ed. 2d at 660. Literally proof of a probability in the subject context can never be to the degree that it is inescapable.

*of Information Council v. Van Wifvat;* all *supra.*[7] There appears to be near unanimity of opinion that, before the public's right of access to pretrial proceedings may be restricted, there must be, in addition to finding a probability of damage to a fair-trial right, consideration of methods alternative to closure, such as continuance, change of venue, and voir dire, and a determination made that alternative measures will probably be ineffective to prevent the threatened prejudice. *See Star Journal Publishing Corp. v. County Court; United States v. Edwards; R.W. Page Corp. v. Lumpkin; Kansas City Star Co. v. Fossey; Ashland Publishing Co. v. Asbury; State ex rel. Smith v. District Court; State v. Williams; Richmond Newspapers, Inc. v. Commonwealth; Federated Publications, Inc. v. Kurtz; State ex rel. Herald Mail Co. v. Hamilton,* all *supra. See also State v. Hannah,* 171 N.J. Super. 325, 408 A.2d 1349 (1979); *Commonwealth v. Hayes,* 489 Pa. 419, 414 A.2d 318, *cert. denied,* 449 U.S. 992, 101 S. Ct. 528, 66 L. Ed. 2d 289 (1980); *In re Daily Item,* Pa. Super. , 456 A.2d 580 (1983); *Herald Association, Inc. v. Ellison,* 138 Vt. 529, 419 A.2d 323 (1980); *Seattle Times Co. v. Ishikawa,* 97 Wash. 2d 30, 640 P.2d 716 (1982).

In cases where closure of pretrial suppression hearings is sought the trial court must make findings as to the nature and extent of any threatened prejudice and, at least as a matter of Maryland procedure, findings concerning the probable efficacy of alternative measures, short of closure, for avoiding probable prejudice. If the conclusion is that some form of restriction on public access is required, the trial court must adopt the least restrictive means necessary to protect the interest which, on the facts of the case, has outweighed public access.

We express no opinion whether, or to what extent, an order closing a pretrial suppression hearing is constitutionally required to be supported by any particular

---

7. *Iowa Freedom of Information Council, supra,* 328 N.W.2d at 925, contains an exhaustive analysis of the cases discussing the showing movant must make to overcome the public's right of access.

finding, other than the overall finding of a reasonable probability of prejudice. This is because the record in the instant matter reflects only a finding of extensive publicity, but there was no finding of a probability of prejudice. Indeed, there was an express finding to the contrary. Prejudice in the context of Buzbee's closure motion means the reasonable probability that an impartial jury could not be impaneled. Even if a prospective juror were to recall reading or hearing any of the publicity concerning the Aspen Hill rapist or about Buzbee, that potential juror would not ordinarily be disqualified from service in one of the seven cases charged against Buzbee if that juror were able to render a verdict based upon the evidence. *See Gray v. State,* 224 Md. 308, 315-16, 167 A.2d 865, 869 (1961); *Piracci v. State,* 207 Md. 499, 511-12, 115 A.2d 262, 267 (1955); *Grammer v. State,* 203 Md. 200, 209-12, 100 A.2d 257, 260-62 (1953), *cert. denied,* 347 U.S. 938, 74 S. Ct. 634, 98 L. Ed. 1088 (1954); *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 328-30, 67 A.2d 497, 510-11 (1949), *cert. denied,* 338 U.S. 912, 70 S. Ct. 252, 94 L. Ed. 562 (1950). If one assumes that two alternate jurors would be selected and that the full number of peremptory strikes would be used by both the State and by Buzbee in each of the seven cases pending in Montgomery County against him, approximately 350 jurors who survived challenges for cause would be required to try all of the cases. As reported by the 1980 United States Census, the population of Montgomery County of persons 18 years of age and over was 424,742. That same census reports 361,446 persons 25 years of age and over to be resident in Montgomery County. Of these, 87.3% were high school graduates and 154,719 had four or more years of college education. There is little wonder that the trial court made no express finding of a probability of inability to obtain an impartial jury. As the Court of Special Appeals emphasized in its opinion in this case, the record lacks any finding of probable inability to select impartial juries by the use of voir dire.

Finally, as the case comes to us, there is a further obstacle to sustaining closure. Buzbee's memorandum of law, filed

with the trial court in support of the motions for restrictive orders, affixed copies of the arrest warrant applications to demonstrate the type of information which Buzbee wished to keep sealed. That information became public prior to our grant of certiorari. We are not, however, informed of the content of the statements which Buzbee is alleged to have made and which are sought to be suppressed. Moreover, the record does not disclose the objects seized under the search warrants, except insofar as newspaper accounts filed in evidence refer to a credit card. The starting point for determining the probability of prejudice is knowledge of that which the accused fears will be publicly revealed. This requirement does not place the accused in a dilemma because the possibly prejudicial material may be revealed *in camera* to the trial court at the hearing of a motion to close the suppression hearing. *See Globe Newspaper Co., supra,* 457 U.S. at 609 n.25, 102 S. Ct. at 2622 n.25, 73 L. Ed. 2d at 259 n.25; *State v. Burak, supra,* 37 Conn. Supp. at    , 431 A.2d at 1248; *United States v. Edwards, supra,* 430 A.2d at 1346; *Patuxent Publishing Corp. v. State, supra,* 48 Md. App. at 693, 429 A.2d at 556-57; *State ex rel. Smith v. District Court, supra,* 654 P.2d at 988; *Westchester Rockland Newspapers, Inc. v. Leggett, supra,* 48 N.Y.2d at 442, 423 N.Y.S.2d at 637, 399 N.E.2d at 525; *Richmond Newspapers, Inc. v. Commonwealth, supra,* 222 Va. at 590-91, 281 S.E.2d at 924; *Seattle Times Co. v. Ishikawa, supra,* 97 Wash. 2d at 39-40, 640 P.2d at 721.

We do not reach the question of whether the right of public access to criminal trials and to pretrial judicial proceedings in criminal cases embraces a First Amendment right to receive information from trial participants, court personnel, or police who might otherwise be willing to furnish information to the press in the absence of a gag order. The gag order in the instant case seems to have been complementary to, and dependent upon the validity of, the record sealing and closure orders. It was not entered to squelch a pattern of prejudicial statements made for attribution or leaked to the press by agents of the State. There is no indication that any

prosecutor or police officer publicly repeated in the period following November 5, 1982, Chief Crooke's reference to Buzbee as the Aspen Hill rapist. The only evidence of communications from the prosecutor's office to the media dealt with court scheduling or confirmed that certain matters had been brought out in the open bail hearing. At the circuit court level, the closure and record sealing orders could have been rendered ineffective if matters restricted by those devices were revealed by persons privy to the information; however, the Court of Special Appeals vacated both the closure and record sealing orders. We have affirmed as to closure, and unsealing of the record is conceded to have become moot. Accordingly, error, if any, by the Court of Special Appeals in vacating the gag order is not prejudicial to the Petitioner and no cross-petition for certiorari has been filed by Respondents.

It is for the foregoing reasons that the judgment of the Court of Special Appeals was affirmed.