755 A.2d 1130

### The BALTIMORE SUN COMPANY et al.

v.

### MAYOR AND CITY COUNCIL OF BALTIMORE.

### The Baltimore Sun Company

v.

### Mayor and City Council of Baltimore et al.

### Nos. 97 & 107, Sept. Term, 1999.

Court of Appeals of Maryland.

July 24, 2000.

---

654

Mary R Craig, Towson, for appellant in No. 97, Sept. Term, 1999.

William R. Phelan, Jr., Principal Counsel (Frank C. Derr, Deputy City Sol., on brief), Baltimore, for appellee in No. 97, Sept. Term, 1999.

Mary R. Craig, Towson, for appellant/cross-appellee in No. 107, Sept. Term, 1999.

William R. Phelan, Jr., Principal Counsel (Duane Verderaime, Associate Legal Counsel, A. Dwight Pettit, Allan B. Rabineau, Michael Marshall of Schlachman, Belsky & Weiner, Eileen A. Carpenter, Kurt L. Schmoke, on brief), Baltimore, for appellees/cross-appellants in No. 107, Sept. Term, 1999.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

ELDRIDGE, Judge.

This Court issued a writ of certiorari in these companion cases, both of which arise from the decision of the Circuit Court for Baltimore City to close the courtroom during a civil proceeding and to issue an order sealing the court record of that proceeding. The principal issue before us is whether the Circuit Court was authorized to close the courtroom and seal the record.

## I.

The underlying civil proceeding which gave rise to both appeals presently before this Court was a wrongful death and survivor action filed by the family of James Quarles, III, who was shot and killed by then Baltimore City Police Officer Charles Smothers, II. The underlying action, titled *Margaret Quarles et al. v. Mayor and City Council of Baltimore et al.,* was the result of a highly publicized incident outside the Lexington Market in Baltimore City in August 1997. Officer Smothers and his co-defendants, the Mayor and City Council of Baltimore, the Police Commissioner, the Police Department, and two other police officers, claimed that the shooting was justified, but the Quarles family contended that the police used excessive force.

The police-involved shooting of James Quarles, III, occurred on a busy Baltimore City street and was recorded on video-

tape by a bystander. The tape was aired on local news broadcasts, and the facts leading up to the shooting were the subject of public debate. Quarles was allegedly wielding a knife when the police were called by Lexington Market security personnel. The police eventually surrounded Quarles with their guns drawn and attempted to encourage him to drop the knife. Officer Smothers alleged that immediately before the shooting Quarles appeared ready to drop the knife, but that he then gripped the handle more tightly, gritted his teeth, and moved forward. Officer Smothers interpreted this action as a "hostile gesture" and fired one shot at Quarles which proved fatal. Criminal charges were never filed against Officer Smothers, based on this incident.

Officer Smothers had pled guilty to a charge of battery based on a domestic violence incident in April 1995, in which it was alleged, *inter alia,* that he fired his gun at his ex-girlfriend and her new boyfriend. Officer Smothers was put back on patrol duty while an administrative hearing about the domestic violence incident was pending. It was during this time that James Quarles was killed. The *Quarles* plaintiffs alleged that the Mayor and City of Baltimore, the Police Department, and the Police Commissioner were negligent in allowing Smothers to return to active duty, and that the defendants collectively violated Mr. Quarles's rights under Articles 19, 24, and 26 of the Maryland Declaration of Rights. The Quarles family sought over $200 million in compensatory and punitive damages.

The case was scheduled for trial on January 25, 1999. During voir dire, however, the parties informed the trial judge that they had reached a "confidential" settlement. Nonetheless, the trial judge ordered the parties to place the terms of the settlement on the record, as it was "the Court's policy ... so that the Court can assure itself that all parties are in agreement and that judicial resources will not be wasted a second time when in fact there's some question in the future as to what the terms of the settlement were." The parties then made a joint request that the courtroom be closed when the terms of the settlement were read aloud and that the court

record documenting the terms be sealed. The trial judge agreed, and issued an order sealing the record on January 26, 1999. When interviewed by the media, both parties expressed their satisfaction with the settlement but refused to disclose any details because of their confidentiality agreement.

The day after the sealing order was issued, the Circuit Court received a letter from the appellant, the Baltimore Sun Company (*The Sun*), a newspaper publisher in the Baltimore metropolitan area. In that letter, *The Sun* requested leave to intervene for the express purpose of "objecting to the courtroom closure and the sealing of any judicial documents regarding the settlement or other disposition of this case." The Court responded by letter to *The Sun* as well as to the parties in the *Quarles* case that it would treat *The Sun*'s letter as a motion to intervene.

Prior to the hearing on the motion, *The Sun* wrote a letter to the City Solicitor requesting "details about the settlement" in the *Quarles* case, pursuant to Maryland's Public Information Act. *See* Maryland Code (1984, 1999 Repl.Vol.), §§ 10–611 through 10–630 of the State Government Article. Before the City responded to the Public Information Act request, the Circuit Court denied *The Sun*'s motion to intervene, and ordered that the terms of the settlement in the *Quarles* case "remain sealed." Shortly thereafter, the City denied *The Sun*'s Public Information Act request, citing §§ 10–615 and 10–617(f) of the Act.

In case number 97 before this Court, *The Sun* and one of its reporters brought suit in the Circuit Court for Baltimore City against the Mayor and City Council of Baltimore in order to enforce its Public Information Act request. The City moved to dismiss the complaint, and *The Sun* filed a motion for summary judgment. The Circuit Court granted the former motion and denied the latter. *The Sun* appealed to the Court of Special Appeals, but this Court issued a writ of certiorari prior to consideration by the intermediate appellate court. *Baltimore Sun v. Baltimore*, 356 Md. 494, 740 A.2d 612 (1999).

In case number 107, *The Sun* appealed the denial of its motion to intervene in the underlying wrongful death and survivor action, arguing that the court violated its rights under the First Amendment by closing the courtroom and imposing the sealing order. The parties in the *Quarles* case collectively contend that the confidentiality order was properly granted due to "compelling interests" and that *The Sun*'s motion to intervene was properly denied as moot because of the termination of the underlying action by settlement. Again, this Court issued a writ of certiorari before consideration of the appeal by the Court of Special Appeals. *Baltimore Sun v. Baltimore,* 356 Md. 497, 740 A.2d 614 (1999).

## II.

The controlling issue in these cases is whether the trial judge's actions in closing the courtroom and sealing the record of settlement were proper. *The Sun* argues that the trial court violated its First Amendment rights under the United States Constitution, and the parties to the *Quarles* case collectively argue that confidentiality interests, the Quarles family's privacy interests regarding personal finances, and the public's interest in encouraging settlements, were all sufficiently compelling to justify the court's actions.

Although constitutional interests may be pertinent when weighing a criminal defendant's right to a fair trial against the public's right of access to court proceedings, *see Baltimore Sun v. Colbert,* 323 Md. 290, 593 A.2d 224 (1991); *News American v. State,* 294 Md. 30, 447 A.2d 1264 (1982), this Court adheres to "the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *Telnikoff v. Matusevitch,* 347 Md. 561, 579 n. 15, 702 A.2d 230, 239 n. 15 (1997), and cases there cited. *See also, e.g., Harryman v. State,* 359 Md. 492, 503 n. 6, 754 A.2d 1018, 1024 n. 6 (2000); *Ashford v. State,* 358 Md. 552, 561, 750 A.2d 35, 40 (2000); *Thrower v. Support Enforcement,* 358 Md. 146, 149 n. 2, 747 A.2d 634, 636 n. 2 (2000); *Dorsey and Craft v. State,* 356 Md. 324, 342, 739 A.2d 41, 51 (1999); *Department of Corrections v.*

*Henderson,* 351 Md. 438, 451, 718 A.2d 1150, 1156–1157 (1998); *Professional Nurses v. Dimensions,* 346 Md. 132, 138, 695 A.2d 158, 161 (1997). In the *Quarles* proceeding, the trial judge violated the common law principle of openness regarding public access to court proceedings and court records. *See, generally, Baltimore Sun v. Colbert, supra,* 323 Md. at 302–306, 593 A.2d at 229–231. Consequently, the sealing order was erroneous.

Although most cases involving public access to court proceedings involve criminal matters, as the Supreme Court noted in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 2829 n. 17, 65 L.Ed.2d 973, 992 n. 17 (1980), "historically both criminal and civil trials have been presumptively open" to the public. In fact, the Court stated, " '[o]ne of the most conspicuous features of English justice, that *all judicial trials* are held in open court, to which the public have free access, . . . appears to have been the rule in England from time immemorial.' " *Richmond,* 448 U.S. at 566–567, 100 S.Ct. at 2822, 65 L.Ed.2d at 983, quoting E. Jenks, *The Book of English Law* 73–74 (6th ed.1967) (emphasis supplied). Justice Stewart, writing for the Court in *Gannett Co. v. DePasquale,* 443 U.S. 368, 386 n. 15, 99 S.Ct. 2898, 2908–2909 n. 15, 61 L.Ed.2d 608, 625 n. 15 (1979), discussed the origins of this "presumption of openness" as follows:

"For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so 'that truth may be discovered in civil *as well as* criminal matters' (emphasis added). Remarks upon Mr. Cornish's Trial, 11 How.St.Tri. 455, 460. English commentators also assumed that the common-law rule was that the public could attend civil and criminal trials without distinguishing between the two. *E.g.,* 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) ('all Causes ought to be heard . . . openly in the King's Court'); 3 W. Blackstone, Commentaries 372; M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820); E. Jenks, The Book of English Law 73–74 (6th ed.1967)."

▇▇▇ The common law principle of openness is not limited to the trial itself but applies generally to court proceedings and documents. As Justice Blackmun stated in his concurring and dissenting opinion in *Gannett*, 443 U.S. at 420, 99 S.Ct. at 2926, 61 L.Ed.2d at 647, "there is little record, if any, of secret proceedings, criminal or civil, having occurred at any time in known English history." Moreover, this Court has recognized that "there is a common law right to inspect and copy judicial records and documents." *Baltimore v. Colbert, supra,* 323 Md. at 305, 593 A.2d at 231, citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570, 579 (1978).

This "legacy of open justice" traveled to America and became an intrinsic element of early colonial governments. *Richmond,* 448 U.S. at 590, 100 S.Ct. at 2834, 65 L.Ed.2d at 998. In Maryland, "the rules of the common law of England were ... adopted as the principles which were to direct the proceedings of the provincial government, whether legislative or judicial...." Bozman, *History of Maryland,* Vol. 2, p. 97. This is evident as early as 1639, when the Maryland General Assembly approved the "Act for the Liberties of the People," which "may rightly be considered the first American Bill of Rights." B. Schwartz, *The Bill of Rights: A Documentary History,* Vol. 1, p. 67. The Act stated, in pertinent part, as follows (W.H. Browne, ed., *Archives of Maryland: Proceedings and Acts of the General Assembly of Maryland,* 1637/8–1664 (1883), Vol. 1, p. 41):

"all the Inhabitants of this Province ... Shall have and enjoy all such rights liberties immunities priviledges and free customs within this Province as any naturall born subject of England hath or ought to have or enjoy in the Realm of England by force or vertue of the common law or Statute Law of England (saveing in such Cases as the same are or may be altered or changed by the Laws and ordinances of this Province)."

The rights embodied in the Act of 1639, specifically the right to the benefits of the common law of England, are presently embodied in Article 5 of the Maryland Declaration of Rights,

originally enacted in August 1776. Article 5 states, in relevant part:

> "the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, . . . subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State."

Although the inhabitants of Maryland are entitled to the common law, that law is subject to modification by legislative acts or by decisions of this Court. *Pope v. State,* 284 Md. 309, 341, 396 A.2d 1054, 1073 (1979). *See Bowden v. Caldor,* 350 Md. 4, 27, 710 A.2d 267, 278 (1998), and cases there cited. The common law rule that court proceedings, records, and documents are open to the public is fully applicable in Maryland except to the extent that the principle has been modified by legislative enactments or decisions by this Court. Consequently, the trial judge in the *Quarles* proceeding could properly have closed the courtroom and issued the sealing order only if authorized by statutes, rules promulgated by this Court, or decisions of this Court modifying the common law principle under specified circumstances.

In the criminal context, this Court has held that a criminal defendant's right to a fair trial may serve as a basis for confidentiality orders. *See Colbert,* 323 Md. 290, 593 A.2d 224; *News American v. State, supra,* 294 Md. 30, 447 A.2d 1264. Moreover, where there is an important privacy interest at stake, the Maryland General Assembly has created exemptions to the common law principle of openness. For example, Code (1974, 1998 Repl.Vol., 1999 Supp.), § 3–812(e) of the Courts and Judicial Proceedings Article, permits the court to "exclude the general public" from "any proceeding in which a child is alleged to be in need of supervision or assistance or to have committed a delinquent act. . . ." *See Baltimore Sun Co. v. State,* 340 Md. 437, 447, 667 A.2d 166, 171 (1995) ("Courts

may close juvenile proceedings to the public in instances where closure would be impermissible in other court proceedings.") Courts are authorized to close hearings and issue orders sealing court records in criminal investigations, Maryland Rule 4–642, attorney discipline hearings, Rules 16–704 and 16–718, and when necessary to preserve trade secrets, Code (1975, 2000 Repl.Vol.), § 11–1205 of the Commercial Law Article. In addition, court orders sealing records are authorized in adoption and guardianship proceedings, Rule 9–112, and juvenile proceedings, Rule 11–121. Certain records are presumed confidential by statute, such as medical records, Code (1982, 1994 Repl.Vol., 1999 Supp.), § 4–302 of the Health–General Article, court records pertaining to a child, Code (1974, 1998 Repl.Vol.) § 3–828 of the Courts and Judicial Proceedings Article, and reports and records of child abuse and neglect, Code (1984, 1999 Repl.Vol., 1999 Supp.), § 5–707 of the Family Law Article.

No statute, rule, or decision by this Court modifying the common law, which would authorize the courtroom closing or the record sealing orders in this case, has been brought to our attention. Furthermore, we are aware of no such statute, rule, or decision. Accordingly, the common law principle that court proceedings, records, and documents are open to the public was fully applicable in this case.

To reiterate, we have clearly recognized, as a matter of Maryland common law, the "public's right of open access to courtrooms," as well as the "right to inspect and copy judicial records and documents." *Colbert*, 323 Md. at 300, 305, 593 A.2d at 229, 231. *See Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546, 1551 (1947). ("What transpires in the courtroom is public property," for "[t]here is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.") The Circuit Court in the case at bar conducted a balancing test, holding that *The Sun*'s right of access to court proceedings and court documents was outweighed by two

"compelling interests," namely the governmental interest in encouraging settlement, and the privacy interests of the *Quarles* plaintiffs. Nevertheless, no statute, rule or common law principle authorized such a balancing test under the circumstances of this case. The Circuit Court erred by closing the courtroom and sealing the record.

### III.

The parties to the *Quarles* case argue that *The Sun*'s motion to intervene was moot, and for this reason, was properly denied by the trial court. They contend that, because the plaintiffs had already dismissed their claims against the City at the time *The Sun*'s motion was filed, the "action had terminated" under Maryland Rule 2–506(a), and "there was no existing claim left to be adjudicated." (Respondent's brief at 14).

Maryland Rule 2–506(a) states that "a plaintiff may dismiss an action without leave of court . . . by filing a stipulation of dismissal signed by all parties who have appeared in the action." In the case at bar, the parties' stipulation of voluntary dismissal was not entered until February 16, 1999, more than two weeks after the Court received *The Sun*'s letter, treated by the court as a motion to intervene, on January 27, 1999. In addition, the court order sealing the record of settlement, which was issued on January 26, 1999, was not entered on the docket until February 3, 1999. Moreover, the order mandated that judgment would not be entered until 40 days had passed, unless a notice was filed that court approval of the settlement would be denied. Final judgment was not entered until June 21, 1999, almost five months after *The Sun*'s motion was filed. Contrary to the City's argument, it is clear that the action had not "terminated" when *The Sun*'s motion was filed.

Even if the parties' stipulation of dismissal and/or final judgment had been entered prior to the filing of *The Sun*'s motion to intervene, however, the appellees' argument is without merit. The trial judge closed the courtroom imme-

diately upon request by the parties, and sealed the court record within 24 hours thereafter. The court did not allow any time for potential objections from members of the general public or the·media. Consequently, the Circuit Court's actions conflicted with this Court's opinion in *Colbert,* 323 Md. at 300, 593 A.2d at 228–229, where Chief Judge Murphy stated for the Court:

"A court's case by case determination concerning whether conditions are present which permit [courtroom] closure requires that representatives of the press and the general public ' "be given an opportunity to be heard on the question of exclusion." ' *Globe [Newspaper Co. v. Superior Court for County of Norfolk],* supra, 457 U.S. [596,] at 609 n. 25, 102 S.Ct. [2613,] at 2621 n. 25[, 73 L.Ed.2d 248, at 259 n. 25 (1982)] (quoting *Gannett Co. v. De Pasquale,* 443 U.S. 368, 401, 99 S.Ct. 2898, 2916, 61 L.Ed.2d 608 (1979) (Powell, J. concurring)).

"Adequate public disclosure of a motion for closure is particularly important because, without it, the public's right of open access to courtrooms might not be asserted by parties to a particular proceeding."

In the present case, the trial judge did not afford *The Sun,* or any other member of the public, time to object to closure before the rulings on January 25 and 26, 1999, that the proceedings would be closed and the record sealed.

 When a court restricts public access to judicial proceedings or documents, Maryland law authorizes a newspaper to intervene for the limited purpose of challenging the restrictions as long as it acts with reasonable promptness. *See Baltimore Sun v. Colbert, supra,* 323 Md. 290, 593 A.2d 224; *Buzbee v. Journal Newspapers,* 297 Md. 68, 465 A.2d 426 (1983); *News American v. State, supra,* 294 Md. 30, 447 A.2d 1264. In the present case, *The Sun* acted promptly. Although the underlying tort issues and the issue of closing the courtroom may have become moot, the dispute over the court's order sealing the record remains a live controversy.

### IV.

 In case number 97, *The Sun* requested that the City Solicitor's office disclose the terms of the settlement in the

*Quarles* case. The Public Information Act, Code (1984, 1999 Repl.Vol.), § 10-615(2)(iv) of the State Government Article, however, prohibits a custodian of a public record from disclosing the record if disclosure would be contrary to "an order of a court of record." When the City Solicitor's office denied *The Sun*'s request for disclosure of the terms of the settlement, and when the Circuit Court upheld that denial, there existed the order in the *Quarles* case sealing the record of the settlement. We shall assume, *arguendo,* that the order sealing the record in the *Quarles* case required the City Solicitor's office to deny, under § 10-215(2)(iv), *The Sun*'s Public Information Act request.[1] Upon this assumption, the Circuit Court did not err in upholding the denial by the City Solicitor's office.

Nonetheless, we are today reversing the order sealing the record in the *Quarles* case. Upon the issuance of our mandate in that case, the record will no longer be sealed, and the terms of the settlement contained in that record will be available for inspection by *The Sun.* As *The Sun* will be able to inspect the court record, presumably the newspaper will have no need to obtain the same information from the City Solicitor's office. Consequently, the Public Information Act case would appear to be moot.

---

**1.** The January 26, 1999, order in the *Quarles* case simply provided "that the Order pertaining to the settlement is hereby SEALED." The order did not impose a confidentiality requirement upon the parties. The matter of confidentiality was based entirely upon the agreement among the parties. Courts generally take the position that the requirements of a public information statute cannot ordinarily be circumvented by agreements between the government officials and others. *See, e.g., Anchorage School District v. Anchorage Daily News,* 779 P.2d 1191 (Alaska 1989); *Des Moines School District v. Des Moines Register,* 487 N.W.2d 666 (Iowa 1992); *Dutton v. Guste,* 395 So.2d 683 (La.1981); *Guy Gannett Publishing Co. v. University of Maine,* 555 A.2d 470 (Me.1989); *The Morning Call, Inc. v. Lower Saucon Township,* 156 Pa.Commw. 397, 627 A.2d 297 (1993); *Daily Gazette Co. v. Withrow,* 177 W.Va. 110, 350 S.E.2d 738 (1986). Because of our assumption for purposes of the present case, we need not further explore this issue.

*IN NO. 107, ORDERS OF THE CIRCUIT COURT FOR BALTIMORE CITY DENYING INTERVENTION AND SEALING THE RECORD ARE REVERSED. COSTS TO BE PAID BY THE APPELLEES.*

*IN NO. 97, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS THE ACTION ON THE GROUND OF MOOTNESS. COSTS TO BE PAID BY THE APPELLEES.*